UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.    04-11807 MLW

```
                                          )
NEW CINGULAR WIRELESS, PCS, LLC           )
 and EASTERN TOWERS, LLC,                  )
                          Plaintiffs,      )
                                          )
       v.                                  )
                                          )
TOWN OF WAYLAND, MASSACHUSETTS,            )
BOARD OF APPEALS of the TOWN OF            )
WAYLAND and JAMES E. GRUMBACH, ERIC B.     )
GOLDBERG, STEVEN FUGARAZZO, LAWRENCE K.    )
GLICK, SUSAN KOFFMAN, SHAUNT SORIAN,       )
ADIA GENNIS, LINDA SEGAL, as they are members )
and alternate members of the Board,         )
                          Defendants.      )
                                          )
```

**<u>MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR JUDGMENT
ON THE MERITS ON COUNT II (SUBSTANTIAL EVIDENCE)</u>**

By its attorneys,

Stephen D. Anderson, Esq. (BBO # 018700)
Douglas H. Wilkins, Esq. (BBO # 528000)
Brian S. Grossman, Esq. (BBO # 641159)
ANDERSON & KREIGER LLP
43 Thorndike Street
Cambridge, MA 02141
(617) 252-6575

Dated: April 15, 2005

Pursuant to Count II (Substantial Evidence), AT&T Wireless PCS, LLC, now known as New Cingular Wireless, PCS, LLC, ("AT&T Wireless") and Eastern Towers, LLC ("Eastern") seek a judgment on the merits on ordering the Town of Wayland ("Town") to grant the necessary zoning permits for a communications installation at 137 Boston Post Road, Wayland, Massachusetts (the "Site") under Section 704 of the Telecommunications Act of 1996, Pub. L. No. 104-104 ("the Telecommunications Act"), codified at 47 U.S.C. § 332(c).

The Town filed the record (cited as "A") on April 1, 2005. The case is therefore ripe for resolution on the substantial evidence point.

## FACTS

AT&T Wireless is licensed by the Federal Communications Commission to provide wireless Personal Communication Services ("PCS") to various geographic areas including Wayland, Massachusetts. A. 290. PCS wireless communication facilities operate by transmitting high frequency, low power radio signals between fixed antenna locations called "base stations" and portable telephones. When there are coverage gaps between base stations, a customer located in the gap will not be able to initiate a phone call, send or receive voice or text messages, send or receive data, or take advantage of other advanced features on the AT&T Wireless network. Id. A. 290-291. If a customer initiates a call on the AT&T Wireless network but then moves out of range of a base station, the quality of service will deteriorate and ultimately the call will be dropped. A. 291.

AT&T Wireless has a gap in coverage in the center of Wayland, along Route 20 and adjoining streets and in surrounding neighborhoods. A. 291, 293-294, 309-313. The gaps in AT&T Wireless' coverage in these areas affect both actual and potential customers living in the area and traveling on these significant commuter roads and the people with whom they would be

communicating in the absence of these significant coverage gaps. A. 291-292. There is no wireless facility in Wayland, and no facility outside of town provides or is capable of providing coverage to Wayland in these areas. A. 291-294. Sprint Spectrum L.P. ("Sprint") also has a coverage gap. A. 95-97, 166-169.

Accordingly, Eastern, AT&T Wireless and Sprint applied on July 17, 2003 for zoning permission for a facility at 137 Boston Post Road, consisting of a 120 foot tall flagpole-style monopole with ground equipment. A. 31ff. A. 47. The proposal features a deep set back from Boston Post Road, and screening by mature tree growth. By employing a flagpole style monopole design with concealed antenna panels, and siting the facility with a substantial (387 foot) setback from Boston Post Road, the Applicants sought to minimize visual and other potential public impacts. A. 265-266. Consistent with the public objective of encouraging antenna co-location, the proposed facility will accommodate 3 to 4 carriers, with an equipment area at the base capable of being expanded to four carriers in the future. A. 266. The demonstrated level of carrier interest in the proposal indicates that the facility would be utilized by at least 3 carriers immediately after it is constructed. A. 47, 770. The proposal would improve wireless communication services to Wayland residents and public safety officials and assist the Town in complying with the TCA. A. 48.

In support of the application, the plaintiffs submitted a brief (A. 49), plans, specifications and voluminous supporting materials, including radio frequency ("RF") reports (A. 95-124), site acquisition documentation (A. 83-93, 129-132) and other expert materials. (A. 125-153). Later, AT&T Wireless submitted supplemental RF plans (A. 280-288) and an extensive report from its radio frequency expert, Timothy Wysocki. A. 289-591. On March 30, 2004, a third carrier, T-Mobile USA Inc. reported to the Board that it, too, was interested in the site "to address a

substantial existing gap in its current network coverage." A. 770. See also A. 1244. Cingular, then a separate company, followed suit on December 17, 2003. A. 1243.

Before filing this application, AT&T Wireless, Eastern and Sprint reviewed numerous proposed locations in an effort to provide the service in question. A. 83-94, 295-302. Despite their search and attempts to pursue other locations and coordinate with the Town, they have been unable to locate a suitable site within the area that would not require a use variance under the Bylaw and that would enable AT&T Wireless to provide coverage in the areas that would be covered by the proposed installation. Id.

### THE WAYLAND ZONING BYLAW

Section 198-1501 of the Wayland Bylaw ("Bylaw") regulates the placement, construction and modification of personal wireless services facilities. In particular, section 1502.1 creates a "Wireless Communications Services District" ("WCSD") which "shall be located on land owned by the Town of Wayland known as the 'old landfill site' [parcel numbers omitted] and part of the land known as the 'new landfill site' [parcel numbers omitted] and on land comprising the portion of the so-called Massachusetts Bay Transit Authority . . . 'right-of-way from its boundary with the southerly sideline of Boston Post Road (route 20), westerly to its westernmost boundary with the Town of Sudbury [parcel numbers omitted], and as shown on" a plan dated September 16, 1999, on file in the Town Clerk's office. Section 198-1503.1 provides that a "wireless communications facility may be erected in the [WCSD] upon the issuance of a special permit by the Planning Board . . . and subject to site plan approval" if the Board finds that the adverse effects will not outweigh the benefits to the town, after consideration of seven factors. Section 1503.2 sets forth conditions for facilities "erected in said district", including a general height limitation of 55 feet (in the absence of a significant tree canopy), design requirements, setbacks and height

requirements for location on BECO towers.   Sections 198-1504 through 1506 establish required

contents for application packages and set forth procedural requirements for approval.  As the

Bylaw contains no provision for a waiver, any application for a facility outside the WCSD

requires a variance under Mass. Gen. Laws c. 40A, § 10.

## THE DECISION

After eight hearings from September 16, 2003 to July 8, 2004 (A. 1694-2121), the Board

denied all relief by decision dated July 30, 2004, filed with the Zoning Clerk on that day. A. 2.

The decision's rationale is discussed below.

## ARGUMENT

**I.    THE ZONING BYLAW AND THE BOARD'S DECISIONS VIOLATE THE
TELECOMMUNICATIONS ACT**

> **A.    The Telecommunications Act of 1996 Requires Substantial Evidence to
> Support the Denial.**

The Act requires that any decision by a municipality regarding personal wireless service

facilities "shall be . . . supported by substantial evidence contained in a written record."  47 U.S.C.

§ 332(c)(7)(B)(iii).  See Second Generation Properties v. Town of Pelham, 313 F.3d 620, 627 (1st

Cir. 2002); Nextel Communications of the Mid-Atlantic, Inc. v. Manchester-by-the-Sea, 115 F.

Supp.2d 65, 66 (D. Mass. 2000).[2]  "Substantial evidence" review under the TCA is "centrally

directed to those rulings that the Board is expected to make under state law and local ordinance in

---

[2]       The Act imposed these limitations because, despite the growing popularity of personal wireless
services, land use applications for such facilities were often subject to interminable delays and denied for pretextual
reasons, a situation which threatened to thwart the development of the facility networks necessary for efficient
utilization of the frequencies dedicated to personal wireless services. See H.R. Rep. No. 104-204, at 94, reprinted in
1996 Code Cong. & Admin. News, at 61.  Accordingly, in the Act, Congress sought to preserve a role for local
authorities in siting personal wireless facilities while ensuring that parochial interests would not frustrate national
telecommunications policy.  See H.R. No. 104-204, at 94, reprinted in 1996 Code Cong. & Admin. News, at 61
("Such requirements will ensure an appropriate balance in policy and will speed deployment and the availability of
competitive wireless telecommunications services which ultimately will provide consumers with lower costs as well
as with a greater range and options for such services.").

deciding on variances, special exceptions and the like." Town of Amherst, NH v. Omnipoint

Communications Enterprises, Inc., 173 F.3d 9, 16 (1st Cir. 1999). "A board may not provide the

applicant with one reason for a denial and, then, in court, seek to uphold its decision on different

grounds. . . . [The applicable model of judicial review] customarily prohibits a court from

affirming an agency on grounds other than those the agency have in its decision." National Tower

v. Plainville Board of Appeals, 297 F.3d 14, 21 (1st Cir. 2002). The familiar contours of the

substantial evidence test apply. ATC Realty, LLC v. Town of Kingston, NH, 303 F3d 91, 93 (1st

Cir. 2002).

      B.    **The Defendants' Denial of the Radio Frequency Needs Violate the Substantial**
          **Evidence Provisions of the TCA.**

        *i.*   *Absence of Substantial Evidence on Radio Frequency Issues*

   AT&T Wireless and Sprint presented undisputed proof of a coverage gap on the side roads

and residential neighborhoods off of Route 20, through standard computer modeling accepted in

the industry and testimony of two RF specialists. A. 291-294, 309-313, 1727-1729 [Tr. 130-141],

A. 1737-1752 [Tr. 16-77]; A. 1769-1770 [Tr. 9-12]; 1945-1950 [Tr. 66-87]; 1959 [Tr. 123].

They also provided maps of projected coverage from tower heights ranging from 75 feet to 110

feet. A. 1687-1690. The Board's dissenting member recognized that the evidence regarding a

coverage gap on the side roads and neighborhoods was uncontested, and cited that fact as the

basis for her vote. A. 17.

     Side roads can have lower signal strength than in the corridor of the main road, as even the

Town's expert recognized. A. 2015 [Tr. 44-45]. Yet, the Board, its expert and the project

opponents focused exclusively upon measuring signal strength on Route 20. That evidence could

not disprove the coverage gap in side roads and neighborhoods, and therefore was not substantial

evidence of a lack of a significant gap. The court "'may not ignore evidence presented by the applicant,'" and where, as here, AT&T Wireless' "'evidence is uncontroverted, there must be a good reason for rejecting it.'" Lincoln, 107 F.Supp. 2d. at 114 (citation omitted). See also, Cellular Telephone Company v. Zoning Borough of Ho-Ho-Kus, 197 F. 3d 64, 72 (3d Cir. 1999). SNET Cellular, Inc. v. Angell, 99 F.Supp.2d 190, 195 (D. R.I. 2000). Here, there was no reason to reject the evidence of a coverage gap on the side roads and neighborhoods. The plaintiffs must prevail on that point alone.

Even the cognizable proof regarding Route 20 unequivocally supported AT&T Wireless' position. Here, as with the analysis of side-roads, AT&T Wireless used industry-standard computer modeling, tuned to reflect AT&T Wireless' own network to predict areas of insufficient or non-existent coverage. See A. 294, 1945. Based upon that modeling, it presented coverage maps that "are commonly relied upon by wireless carriers, zoning boards, and courts to determine the extent of coverage in a given locality." Nextel Communications of the Mid-Atlantic, Inc. v. Town of Sudbury, 2003 WL 543383 at *12 (D. Mass. 2003). The Board was not free to ignore this fully admissible expert testimony from a radio frequency specialist that calls were likely to be degraded or dropped in the Coverage Gap. Ho-Ho-Kus, 197 F. 3d at 72-73 (3d Cir. 1999) (reversing local board under the substantial evidence test where there was "substantial, unrefuted evidence in the record"); SNET, 99 F. Supp. 2d at 195. Nor was it free to require additional evidence, such as a drive test, in light of expert testimony validating the use of the computer projections. See Lincoln, 107 F.Supp. 2d at 118 n. 11 (computer projections demonstrate

significant gaps in coverage, notwithstanding Town's contention that a drive test should have

been done)(dictum).[3]

The initial report of the Town's consultant, David Maxson, concluded that "it is my

opinion that there is a gap in AT&T service along Route 20 in the vicinity of the proposed

facility." A. 1214. He opined that the gap "could be as little as ½ mile and as much as a mile and

a half in length along Route 20, depending on what signal level threshold actually applies . . .."

and other factors. Id. "By a likely future AT&T measure the gap is even wider than it has

shown." A. 1220, 1956 [Tr. 110 to 111].[4] This basically confirmed AT&T Wireless' analysis. A.

309-313. See National Tower Corp. v. Frey, 164 F.Supp.2d 185, 188 n.1 (D. Mass.)(two mile gap

on a major highway is significant), aff'd on other grounds, 297 F.3d 14 (1st Cir. 2002).

In a statement that became more important later on, Mr. Maxson approximated the signal

strength for "in-building service" as "-85 dBm" (a stronger signal than -95dBm). A. 1219. AT&T

Wireless' expert, Mr. Wysocki, confirmed that -85dBm is "appropriate for competitive network

in a suburban environment specifically to provide in-building coverage to houses."[5] A. 1956 [Tr.

110-111]. Maxson acknowledged that this level of signal would likely be significant "for local

in-building service in the future" and that it would "be imprudent to overlook" that possibility. A.

1219. Maxson opined that, at the -85 dBm level, "the gap is substantial in size." Id.

Mr. Maxson did testify later regarding impromptu partial measurements that he took on

---

[3]       AT&T Wireless' expert disclosed the existence of drive tests during the winter and predicted greater difficulties during late spring through early fall. A. 1947 [Tr. 76]. He also explained the impact of foliage in reducing the signal below what was perceived, or even measured, during months when leaves are off the trees. A. 1946, 1950.

[4]       "By any measure, there is not likely to be reasonably uninterrupted communication along at least a small stretch of Route 20." A. 1220, p. 8.

[5]       Mr. Wysocki also accounted for the differences between the plane sensitivity (-104dBm) and the

Route 20 with equipment while he was driving in his car with his daughter. A. 2010-2011 [Tr. 25-26]. Mr. Maxson acknowledged that "it was not a full drive test, but . . . a series of measurements along Route 20" and that "there are locations where it does appear the signal strength falls to the minus 95 dBM level, perhaps a little below it." A. 2011 [Tr. 26]. He recommended "[a] more rigorous drive test" (A. 1235) and did not address signal strength on side-roads off of Route 20. Mr. Maxson's own spot measurements show that 8 of 14 readings fall below -85dBm, ranging from -91dBm to -98dBm, even on Route 20 itself, thus confirming the gap for in-building coverage under the criterion Maxson acknowledged. Indeed the <u>Nextel</u> litigation specifically addressed an even stronger (-81 dBm) signal strength standard and found a gap in coverage based upon evidence that addressed that -81 dBm standard. A. 514, 523. See A. 582, 586 [Maxson affidavits][6].

The Board received some material compiled by interested persons not expert in radio frequency engineering, namely subjective evaluations by opponents of call quality, a tape recording and the like. One so-called lay "test", presented by perennial wireless tower opponent Margaret Patton, allegedly consisted of driving once on Route 20 at a low-volume time of day in the fall (2PM to 2:30 PM on October 15), included some areas outside the Coverage Gap and showed evidence of a loss of signal strength near Shir Tikva Temple. A. 2007-2010 [Tr. 11-24].

---

signal strengths needed to operate a network in a suburban environment. A. 1956 [Tr. 110-111].

[6]        In <u>Nextel</u>, Maxson stated that Nextel's "plotted level (-81 dBm) is chosen to be strong enough outdoors to remain useful after it penetrates a car. Thus, Nextel is mistaken in stating that the measured signal levels in the drive test I conducted relate only to 'outside users of phones.'" A. 582. To be sure, Mr. Maxson nominally disagreed with that signal (<u>id.</u>) and stated that phones will function receiving signals 10 or 20 dBm lower than -81 dBm (A. 544), but that begged the question –outdoor signal measurements do not mean that a phone indoors will receive the same measured signal strength; on the contrary, an indoor phone will receive an weaker signal due to absorption or other attenuation caused by the outside of the car or building, as illustrated by the -85 dBm level for in-building coverage accepted by Maxson and Wysocki in the transcript of the hearings before the Wayland Board. Perhaps for that reason, Maxson's <u>Nextel</u> affidavit "adopted the Nextel signal strength threshold of – 81 dBm, with the understanding that signals often fall below this level and remain usable." A. 544.

A second involved a lay person, Mark Hays, borrowing testing equipment, connecting it to a personal computer, driving Route 20, and taking samples. A. 2016-2018 [Tr. 49-54].[7] Reflecting his lack of expertise, Mr. Hays did not confine his testing to the area within which AT&T Wireless provided evidence of its significant gap. Instead, he drove the length of Route 20 from the Wayland/Weston border to the Wayland/Sudbury border and reported an average number he claimed showed existing AT&T wireless coverage. A 2021 [Tr. 66-67]. Mr. Hays thus artificially increased his average number by including irrelevant areas where, he knew, AT&T Wireless already had coverage. Further skewing his results, Mr. Hays' samples were only taken (a) along Route 20 and not the side corridors A. 2016 [Tr. 49] and (b) in February (when interference from foliage is minimized). A. 843; 2013-2015 (Tr. 36-42). Mr. Hays provided no data regarding the actual location of any of the samples, so there is no evidence concerning the number of samples actually taken within, or outside of, the area comprising AT&T Wireless' significant gap. A. 2021. [Tr. 66] Mr. Hays' test was therefore not substantial evidence to rebut the existence of AT&T Wireless' significant gap in coverage.

Countering this lay presentation, one resident reported "lousy" service (A. 1217) and one Board member reported her inability to connect to the network on Lee Road, one and one-half blocks from Route 20. Id., p. 43. Such anecdotal testimony from laypersons about coverage somewhere on Route 20, depend upon "subjective impressions of how [a user's] phone functioned" at unspecified places and times, and is not the type of information upon which a reasonable person would rely. See Town of Sudbury, 2003 WL 543383 at *12. Such statements, even where accompanied by a tape recording (as here) have no relevance to the proposed facility

---

7       No evidence was introduced demonstrating that Mr. Hays is trained in radio frequency engineering and qualified to setup, calibrate, and perform the testing he describes. Mr. Hays' general experience with computer equipment does not qualify him to operate this type of equipment.

and therefore are not substantial evidence, without some proof linking them to the Coverage Gap at issue here. Cellular Telephone Co. v. Borough of Ho-Ho-Kus 197 F.3d 64, (3d Cir. 1999)("the tape recordings made by non-expert local opponents of the proposed facility were too insubstantial to discredit the expert testimony presented by the providers."). See ATC Realty, 303 F.3d at 93.

By contrast, AT&T Wireless' modeling reflects the area of the coverage gap on adjoining roads and residences, was tuned to reflect the experience on AT&T Wireless' specific network and considers factors bearing upon signal strength. A. 1945-1948. The opponents' so-called "testing" does not, and has no probative value for purposes of determining a coverage gap.

In short, there was no evidence disputing the existence of a significant coverage gap (1) on the side roads and residences near Route 20 and (2) for in-building coverage throughout the area.

## II.    THE BOARD'S DECISION REGARDING ALTERNATIVES LACKS SUBSTANTIAL EVIDENCE

The Board's discussion of alternatives also lacks support in substantial evidence. Both before and after the AT&T Wireless application, the Town, though its Selectmen and Town Administrator (A. 22, 298, 455, 774, 776; Nextel) have taken the position that any tower should be located in the Wireless Communications Services District (i.e. the old landfill). Yet, the Town well knows that such a location cannot provide coverage to the Coverage Gap. The Town's own expert confirmed that conclusion. A. 1214 ("coverage from the Sudbury-Wayland line will not fulfill the entire segment of Route 20 in eastern Wayland.").

The Town, through the Zoning Board, is now once again displaying a "hostile" attitude toward wireless communications facilities. Nextel Communications of the Mid-Atlantic, Inc. v. Town of Wayland, 231 F.Supp. 2d 396, 406-407 (D. Mass. 2002). The record (A. 506-532)

includes the Court's decision in that case and a long history of AT&T Wireless' efforts to site a

facility in Wayland. A. 295-302 and exhibits cited. The <u>Wayland</u> Court's discussion of the facts

in that case (at pp. 406-407) addresses the same municipal conduct and applies with full force

here.

> First, it is undisputed that, in 1994, the Town denied Nextel authorization to construct a monopole antenna tower. After this first denial, Nextel obtained permission from BECO to attach antennas to BECO 111 and filed an application with the Wayland Planning Board for review of the proposed facility. Before Nextel could receive approval, the Town enacted a twelve-month moratorium. This twelve-month moratorium was disapproved by the Attorney General and the Town then enacted a six-month moratorium. The Town further delayed Nextel's attempt to build the tower when it repealed and modified its zoning by-law provisions three times...Also, when Nextel filed the application for variance (in response to the Town's concerns that the ANR did not allow all components of the still-pending original application) the Town further delayed Nextel by holding five public hearings stretching over eight months.

AT&T Wireless' experience at virtually the same location began in approximately 1998,

when it worked to site its facility at the neighboring electric transmission tower, known as BECO

Tower No. 112. A. 295. At the time AT&T Wireless proposed the Tower 112 facility (to be

collocated with a proposed facility of Omnipoint Communications, now T-Mobile), it relied on an

exemption to the Wayland Wireless Communications Services District Bylaw, the stated purpose

of which was to "Encourage Use of Boston Edison Company Transmission Towers for Wireless

Communications Facilities" (as the title of the Article states). <u>Id.</u> Wayland citizens[8] and/or the

Town of Wayland then attempted to stop the construction of the proposed facility by (1) Initiating

and passing the same one-year Moratorium and revised Wireless Bylaw just discussed in <u>Nextel</u>;

(2) Opposing AT&T Wireless' and Omnipoint's request that the Massachusetts Historical

---

[8]      <u>Patton v. Planning Bd. of Wayland</u>, No. MICV99-01312 (Sup. Ct. filed Oct. 4, 2001) (Dismissing neighbors' appeal of Planning Board Site Plan Approval), *appeal dismissed for lack of prosecution*, No. 01-P-1858 (Mass. App. Ct. filed Apr. 8, 2002). <u>Patton v. Planning Bd. of Wayland</u>, No. MICV98-3576 (Sup. Ct. filed Oct. 3, 2001) (Dismissing neighbors' appeal of Planning Board's endorsement of ANR Plan), *aff'd* 56 Mass. App. Ct. 1107, 778 N.E.2d 31 (2002), *further app. rev. denied*, 438 Mass. 1106, 782 N.E.2d 516 (2003).

Commission make a finding of "no adverse effect" of the proposed facility on historical or archaeological resources and (3) Initiating and passing a revised delineation of the Historic District in Wayland Center to include the area of the proposed facility. Ultimately, the Town's opposition succeeded, as the Massachusetts Historical Commission issuing an "adverse effect" finding for the proposed project on BECO Tower No. 112 on March 9, 2001, requiring AT&T Wireless to investigate "alternative project locations, designs, engineering and access routes" to mitigate any adverse effects on the historical and archaeological resources identified by MHC. A. 295-300.

Ironically, this past history led directly to the present application for two viable alternative sites (135 and 137 Boston Post Road) that would completely eliminate any adverse effects of AT&T Wireless' proposed facility on the Wayland Center Historic District or the historical and archaeological resources in the former railroad right-of-way. A. 297.

Echoing prior themes, the Zoning Board now purports to fault AT&T Wireless for what it deemed an incomplete investigation of BECO towers 120 through 132. A. 17-18. It acknowledges that AT&T Wireless did review the towers and did determine that "none of the BECO towers [was] feasible, due to a variety of reasons relating to potential ability to lease, ingress, or egress, construction issues, etc." Id. AT&T Wireless cited facts regarding wetlands and constructability problems, the close proximity of these towers to residences and the strong history of opposition to any wireless facilities by Town residents, supported if not fueled by Town officials. A. 1575-1585. While the Board claimed that AT&T Wireless "provided more in the way of argument than convincing evidence", there was, in fact, no evidence contradicting AT&T Wireless's facts on this point, let alone any evidence that any of these topographic or environmental obstacles could be overcome, that legal access could be secured or that there

-12-

would be any less opposition from the residential neighborhoods in those areas to a wireless facility. On the contrary, ample evidence cast grave doubt as to the availability and feasibility of any BECO sites.

Crucially, the Board's Decision also presupposes, without evidence, that the BECO towers would be permitted by the Town. The Decision therefore contains the same defect as in <u>Wayland</u>. No evidence emerged suggesting that permits "will be forthcoming" for BECO 120-132, when the Town had denied all other BECO towers or, indeed, any other meaningful location within the Town (i.e. any location other than the unusable Wireless Communications Services District):

> Although the Town is correct that the requirements of additional permits do not ordinarily make alternative sites unfeasible, the Town cannot show that those permits will be forthcoming. Instead, the undisputed evidence shows repeated delays and denials that, when viewed in the aggregate, demonstrate the Town's hostility towards Nextel. Nextel, therefore, has met its burden of showing "from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." <u>Amherst</u>, 173 F.3d at 14.

<u>Wayland</u>, 231 F.Supp.2d at 407.

The Zoning Board claimed that AT&T Wireless and Sprint adopted "clearly conflicting positions" because Sprint continued to investigate the feasibility of BECO towers 120-132. <u>Id</u>. This did not reflect a conflict, but only a different level of tolerance for the Town's delaying tactics. Having dealt with Wayland for years, AT&T Wireless simply did not believe the Town was serious, for the same reasons as the <u>Wayland</u> court.

Only a Board imbued with a rigid anti-wireless philosophy could look at AT&T Wireless' site acquisition evidence (A. 83-93, 129-132) and conclude that a review of approximately 56 separate parcels (A. 89, 91-94, 1965) (in addition to the BECO towers) was not "an exhaustive search of potential sites. A. 18, 1962-1968 [Tr. 135-159]. AT&T Wireless and Sprint submitted the only evidence on this point. The Board cited no evidence opposing AT&T Wireless' site

-13-

acquisition presentation, nor did it offer a hint of what alternate location it might approve, beyond

the chimerical invocation of BECO stanchions 120-132. See Town of Amherst, New Hampshire

v. Omnipoint Communications Enter., Inc., 173 F.3d 9, 17 (1st Cir.1999)("Nor in the face of a

vigilant district court, can the town exhaust applicants by requiring successive applications

without giving any clue of what will do the trick.").

Finally, the Board's discussion of technological alternatives provided no basis for its

decision, let alone an outright denial. It mentioned the Distributed Antenna System (DAS) being

"investigate[d]" in Nantucket (A. 1960 [Tr. 129]), but the testimony disclosed only that such a

system would not support certain services. (A. 1961 [Tr. 131]) and that, to cover Route 20 (not

the surrounding homes) would require transmitters on poles at numerous locations outside the

WCSD, placed "every 1/4 mile or so" in the words of the Town's expert. A. 1220.  Each of these

transmitters on telephone poles would require Town consent where the pole is on Town land, and

would be outside the wireless district, requiring use and dimensional variances, with no

encouragement, let alone assurance, that the Board would grant all these variances. The Board's

consideration of a shorter tower failed to acknowledge that AT&T Wireless presented evidence

on shortened heights (A. 310-315, 1687-1960) and that many carriers were interested in this site,

necessitating the proposed tower height, unless the Board preferred a number of smaller towers.

However, the alternatives analysis submitted by AT&T Wireless and Sprint demonstrates that no

other parcels in the area were available for lease and therefore, they would be unable to design a

more than two-site solution.

The quantity and location of these uncovered roads and buildings are important factors in

proving a significant, prohibitive coverage gap, where here the gap "straddles a significant

commuter highway" not just a "small residential cul-de-sac," and (b) "covers a well-traveled road

[that] could affect large numbers of travelers - - and the people who are trying to communicate with them." Ho-Ho-Kus at 69 & n.2.; Lincoln, 107 F.Supp. at 119; See National Tower, 164 F. Supp.2d at 188 n.1; Charette, 242 F.Supp. at 418. The dense population in this Boston suburb, along with the traffic on and near a state-numbered route, easily meet this test. A. 292, 309, 1655. "The argument that no tower is needed is unavailable to the town." National Tower, 297 F.3d at 19. See Second Generation Properties, L.P. v. Town of Pelham, 313 F.3d 620, 629 (1st Cir. 2002). Denial of a tower to fill this gap violates the effective prohibition provision in three independent ways.

This District has held that further applications to this very same Board would be fruitless. Nextel Communications of the Mid-Atlantic, Inc. v. Town of Wayland, 231 F.Supp. 2d 396, 406-407 (D. Mass. 2002) (commenting on the Town's "hostile" attitude toward wireless communications facilities since Nextel's first application, in 1994, and concluding "[u]nder the Telecommunications Act, the Board cannot deny the variance if in doing so it would have the effect of prohibiting wireless services").

This Court concluded in Nextel (at id.):

Nextel has met its heavy burden of showing the Town's hostility, and therefore that any further efforts would be so likely to be fruitless, that it is futile even to try. The Town has presented no convincing arguments to the contrary.

That case concerned the Town's first eight years of obstructionism – which now have reached ten years, as chronicled above. Yet, the Board denied AT&T Wireless' application and sent Sprint on a fruitless quest for yet another group of BECO towers – which the Town had expressly zoned to be outside its Wireless Communications Services District.

The Board's purported alternatives of other BECO towers or distributed antenna systems violate the WCSD, where the Board "cannot show that those [variances and] permits will be

-15-

forthcoming", particularly in the face of its historic resistance to wireless facilities.[9]
Wayland, 231 F.Supp.2nd at 407; See also Omnipoint Communications MB Operations, LLC v. Town of Lincoln, 107 F.Supp. 2d 108, 117 (D. Mass. 2000) (invalidating wireless overlay bylaw that limited wireless facilities to areas that could not cover the whole town), cited in Nat' Tower, 297 F.3d at 20.

AT&T Wireless made "a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the other alternatives are not feasible to serve its customers." Southwestern Bell, 244 F.3d at 63. This showing is, as the First Circuit has suggested, "sufficient to support an allegation that the zoning board permit denial effectively prohibits personal wireless services in the area." Id. Omnipoint Communications MB Operations, LLC, v. Town of Lincoln, 107 F. Supp.2d 108, 116-120 (D. Mass. 2000). See also Town of Amherst, New Hampshire v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 14 & n. 4 (1st Cir. 1999). Here, AT&T Wireless has investigated over 50 alternate locations both on municipal and private property, in residential and non-residential zones. A. 89, 91-94, 1962-1968 [Tr. 135-159]. None meets the coverage need in a manner that comports with the Town's bylaw and expressed insistence upon locations pre-approved by that bylaw. Coverage from the WCSD is not feasible. A. 298-301.

Moreover, as documented above, Wayland has denied numerous attempts for wireless facilities to cover the relevant area – four by permit denial (Nextel monopole, Boston Edison Co. ("BECO") Tower No. 111, 135 Old Post Road and 137 Old Post Road), one through historic

---

[9]    Indeed, as later events, reported in the accompanying Memorandum in Support of Motion for a Preliminary Injunction show, neighbors on Plain Road living near the BECO towers appeared before the Board in the parallel Sprint proceeding (for 135 Boston Post Road) to express their concerns regarding the BECO towers, even before any application for those towers had been filed. Transcript of Sprint hearing (December 14, 2004), pp. 31, 71-72 (Ms. Seldon and Ms. Reinhardt and "a lot of residents from Plain Road"). The Board's Chair was quick to respond that "[i]t was not the ZBA that proposed that tower," i.e. BECO 131. Ms. Reinhardt wanted assurance that the BECO option was "dead", and, after Sprint responded, another board member observed: "dead issue." Id., p. 74. All of this

district laws (BECO No. 112). AT&T Wireless and other carriers have thus made "successive applications," which the Town has denied "without giving any clue of what will do the trick." Amherst, 173 F.3d at 17.

### C.    The Board's Other Rationales Violate the TCA.

The Board advances other rationales, none of which is supported by substantial evidence.

*i.    Property Values*

AT&T Wireless presented expert appraisal evidence from Deborah Haskell, showing that construction of towers has not had a negative impact on property values. A. 219-239, A. 1770-1778 [Tr. 13-45]; A. 1867 [Tr. 178-179]; A. 1902-1911 [Tr. 33-66]; The Board dismissed that testimony as "unpersuasive." A. 18. Instead, it relied on "some testimony that the proximity of high tension wires, or stigma, had previously had a diminishing impact on Wayland real estate" and "other evidence", not specified. Id. This was not substantial evidence.

First, the impact of a tower upon real estate values is a matter of proof, requiring expert appraisal testimony, not an opportunity for *ipse dixit* by abutters or the Board. Nextel Communications, Inc. v. Manchester-by-the-Sea, 115 F.Supp 2d 65, 71-72 (D. Mass. 2000). The evidence opposing the tower was not expert testimony applicable to this tower. Second, in similar contexts, the First Circuit has distinguished between site-specific concerns and concerns that "refer to negative comments that are applicable to any tower regardless of location."

---

confirms what AT&T Wireless concluded last summer: the other options mentioned by the Board were futile.

<u>Todd</u>, 244 F.3d at 61 (visual impact); <u>Nextel Communications of the Mid-Atlantic, Inc. v. Town</u>

<u>of Sudbury</u>, 2003 WL 543383 (D. Mass. 2003)(same) and cases cited. See <u>ATC</u>, 303 F.3d at 97-

98. If concerns applicable to any tower constituted substantial evidence, localities could deny

almost any application because "[f]ew people would argue that telecommunication towers are

aesthetically pleasing."[10] <u>Todd</u>, 244 F.3d at 61. The Board's generalized comments would apply

to any tower and therefore are not substantial evidence to deny this tower for these reasons. <u>Id.</u>

Courts have frequently annulled local zoning denials which were based on the alleged visual

impacts and/or alleged adverse impacts on neighboring property values. See, <u>e.g.</u>, <u>Manchester</u>,

115 F.Supp. at 72 and cases cited

   <em>ii.  Fall Zone</em>

  Finally, the Board seized upon the news of the day, citing the then-recent failure of a

differently designed and constructed tower, not occupied by AT&T Wireless, in Oswego, New

York. A. 18. Two fully qualified experts testified – without competent contradiction – that the

proposed tower was designed according to applicable codes and to protect public safety. A. 1496-

1499. The Board claimed that photographs of the Oswego failure "belie the opinions" of those

experts but equated the Oswego tower with the proposed tower without any evidence of structural

similarity and in the face of contrary expert opinion. As the First Circuit has observed, "[i]n a

number of cases, courts have overturned denials of permits, finding (for example) that <em>safety</em>

<em>concerns</em> and aesthetic objections rested on hollow generalities and empty records." <u>Town of</u>

<u>Amherst, New Hampshire v. Omnipoint Communications Enter., Inc.</u>, 173 F.3d 9, 16 (1st

Cir.1999)(emphasis added) and cases cited. This is one of those cases. <u>Group EMF, Inc. v.</u>

---

   [10]  In <u>Todd</u>, the Board acted properly because the comments "specifically addressed whether this 150-foot tower was appropriate for this particular location, on the top of a fifty-foot hill in the middle of a cleared field" in

Coweta County, 131 F.Supp. 2d 1335 (N.D. Ga. 2000), citing OPM-USA-Inc. v. Brevard

County, Florida, 7 Supp.2d 1316, 1324 (M.D. Fla. 1997); Iowa Wireless Serv., L.P. v. City of

Moline, 29 F.Supp.2d 915, 921 (C.D. Ill. 1998); See also Omnipoint Communications, Inc. v.

Village of Tarrytown Planning Board, 302 F.Supp.2d 205, 222-23 (S.D.N.Y. 2004).

## III.    THE PROPER REMEDY IS AN ORDER TO ISSUE THE REQUESTED ZONING RELIEF

Once it finds a violation of the TCA, this Court's role is no longer simply one of

deferential and limited review, but entails enforcement of the TCA's requirements that the Board

act within "a reasonable period of time" and that the reviewing court hear and decide the case "on

an expedited basis." National Tower, 297 F.3d at 20, quoting 47 U.S.C. §332(c)(7)(B)(ii), (v).

The First Circuit has been quite clear that, "in the majority of cases the proper remedy for a

zoning board decision that violates the Act will be an order . . . instructing the board to authorize

construction." National Tower, 297 F.3d at 21-22.

Application of this principle is particularly appropriate here for several reasons. The

Board has indicated its hostility to filling the Coverage Gap for wholly impermissible reasons,

including a basic hostility to wireless facilities, a six-year pattern of delay and denial, objections

to filling a previously acknowledged coverage gap, objection to visual attributes shared by all

towers, among others. Sending the matter back to the same Board for review of the application

would lead to the same "multiple rounds of decisions and litigation" that Congress intended to

prevent. National Tower, 297 F.3d at 21-22. This "board is not prepared to permit construction

on [the applicants'] chosen site", regardless of the evidence. See id. at 24. In short, this is a

typical TCA case, where "the proper remedy for a zoning board decision that violates the Act will

the "geographic center of town, where is "would be seen daily by approximately 25% of the Town's population." Id.

be an order . . . instructing the board *to authorize construction*". Id. (Emphasis added).  See also

Tarrytown, 302 F.Supp. at 225-26.

## CONCLUSION

For the foregoing reasons, the Court should grant the plaintiffs' motion for summary

judgment, invalidate the Bylaw's prohibitive features, and order that the plaintiffs be permitted

immediately to install their facilities at the Site.[9]

By its attorneys,

_____
Stephen D. Anderson, Esq. (BBO # 018700)
Douglas H. Wilkins, Esq. (BBO # 528000)
ANDERSON & KREIGER LLP
43 Thorndike Street
Cambridge, MA 02141
(617) 252-6575

Dated: April 15, 2005

_____

[9]    In resolving such appeals under the Act, federal courts (including this Court) have frequently
ordered the issuance of the requested permits on the grounds that such relief best serves the Act's stated goal of
expediting resolution of these types of actions and that remand to the Board would serve no useful purpose.  See
Brehmer; Town of Amherst, NH v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9 (1st Cir.
1999); Omnipoint Communications MB Operations, LLC, v. Town of Lincoln, 107 F.Supp.2d 108 (D.Mass. 2000);
Telecorp Realty, LLC v. Town of Edgartown, 81 F.Supp.2d 257, 261 (D.Mass. 2000); Cellco Partnership v. Town of
Douglas, 81 F.Supp.2d 170, 175 (D.Mass. 1999); Sprint Spectrum L.P. v. Town of Easton, 982 F.Supp. 47, 52
(D.Mass. 1997).

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing on the defendants by causing a copy to be mailed to their counsel of record listed below on this 15th day of April, 2005.

Patricia A. Cantor, BBO#072380
Kopelman & Paige LLC
31 St. James Avenue, 7th Floor
Boston MA 02116-4102

_____
Douglas H. Wilkins

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(a)(2), I certify that I conferred by phone with Patricia Cantor on April 12, 2005 in a good faith attempt to resolve or review the issues raised in this Motion.

_____
Douglas H. Wilkins

g.\docs\att\waylandeasternlit\p\memosubstevid.doc

-21-