UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.   04-11807 MLW

|  |  |
|---|---|
| NEW CINGULAR WIRELESS, PCS, LLC and EASTERN TOWERS, LLC,<br>         Plaintiffs,<br><br>   v.<br><br>TOWN OF WAYLAND, MASSACHUSETTS, BOARD OF APPEALS of the TOWN OF WAYLAND and JAMES E. GRUMBACH, ERIC B. GOLDBERG, STEVEN FUGARAZZO, LAWRENCE K. GLICK, SUSAN KOFFMAN, SHAUNT SORIAN, ADIA GENNIS, LINDA SEGAL, as they are members and alternate members of the Board,<br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

By its attorneys,

Stephen D. Anderson, Esq. (BBO # 018700)
Douglas H. Wilkins, Esq. (BBO # 528000)
Brian S. Grossman, Esq. (BBO # 641159)
ANDERSON & KREIGER LLP
43 Thorndike Street
Cambridge, MA 02141
(617) 252-6575

Dated: April 15, 2005

Pursuant to Fed. R. Civ. P. 65(a), AT&T Wireless PCS, LLC, now known as New Cingular Wireless, PCS, LLC, ("AT&T Wireless") and Eastern Towers, LLC ("Eastern") seek a preliminary injunction ordering the Town of Wayland ("Town") to grant the necessary zoning permits for a communications installation at 137 Boston Post Road, Wayland, Massachusetts (the "Site") under Section 704 of the Telecommunications Act of 1996, Pub. L. No. 104-104 ("the TCA"), codified at 47 U.S.C. § 332(c).

## FACTS

AT&T Wireless is licensed by the Federal Communications Commission to provide wireless Personal Communication Services ("PCS") to various geographic areas including Wayland, Massachusetts. Affidavit of Timothy Wysocki ("Wysocki Aff"), ¶ 6. PCS wireless communication facilities operate by transmitting high frequency, low power radio signals between fixed antenna locations called "base stations" and portable telephones. When there are coverage gaps between base stations, a customer located in the gap will not be able to initiate a phone call, send or receive voice or text messages, send or receive data, or take advantage of other advanced features on the AT&T Wireless network. Id. ¶ 8; A. 1945-1950 [Tr. 66-89]. If a customer initiates a call on the AT&T Wireless network but then moves out of range of a base station, the quality of service will deteriorate and ultimately the call will be dropped. Id.

AT&T Wireless has a gap in coverage in the center of Wayland, along Route 20 and adjoining streets and in surrounding neighborhoods, as shown in detail by the Wysocki Aff. ¶¶ 24-58. See also the record before the Board, cited in Plaintiffs' Memorandum In Support of Their Motion for Judgment on the Merits of Count II (Substantial Evidence) ("Plaintiff's Substantial Evidence Memo), pp. 5-10. The gaps in AT&T Wireless' coverage in these areas affect both actual and potential customers living in the area and traveling on these significant commuter roads and the people with whom they would be communicating in the absence of these

-1-

significant coverage gaps. Id., ¶ 32, 52-58. There is no wireless facility in Wayland, and no facility outside of town provides or is capable of providing coverage to Wayland in these areas. Id. ¶¶ 13, 19, 24-58, 68.

AT&T Wireless has reviewed numerous proposed locations in an effort to provide the service in question. Wysocki Aff. ¶¶ 71-74; Dwight/Hesse Aff. Despite its search and attempts to pursue other locations and coordinate with the Town, it has been unable to locate a suitable site within the area that would not require a use variance under the Bylaw and that would enable AT&T Wireless to provide coverage in the areas that would be covered by the proposed installation. Id.

After the proceedings before the Board, AT&T Wireless PCS, LLC was acquired by Cingular Wireless and renamed "New Cingular Wireless, PCS, LLC". Therefore, Mr. Wysocki has submitted a second affidavit, analyzing the combined and integrated facilities of the former AT&T Wireless network at 1900 mHz and the Cingular network (at 800 mHz)("Combined Network"). Second Affidavit of Timothy Wysocki to Address Cingular Network, ¶¶ 7 - 16 ("Second Wysocki Aff."). The Combined Network's design seeks to provide in-building, suburban coverage, for which Cingular needs a signal strength of -82 dBm, as explained and justified in Exhibit 3 to the Second Wysocki Affidavit. The existing Cingular signal strength in the 800 mHz band leaves a significant gap in coverage, as shown by Exhibit 1 to the Second Wysocki Affidavit. Even after combining the two networks, there is a gap about 1.2 or 1.3 miles in -85 dBm coverage on Route 20, and a gap along Route 20 even at – 95dBm. Second Wysocki Aff., ¶ 15 and Ex. 2. The existing facilities, all located outside Wayland, do not permit Cingular's Combined Network to fill the coverage gap that has existed all along in this case. Second Wysocki Aff. ¶ 15.

## THE WAYLAND ZONING BYLAW

Section 198-1501 of the Wayland Bylaw ("Bylaw") regulates the placement, construction and modification of personal wireless services facilities. In particular, section 1502.1 creates a "Wireless Communications Services District" ("WCSD") which "shall be located on land owned by the Town of Wayland known as the 'old landfill site' [parcel numbers omitted] and part of the land known as the 'new landfill site' [parcel numbers omitted] and on land comprising the portion of the so-called Massachusetts Bay Transit Authority . . . 'right-of-way from its boundary with the southerly sideline of Boston Post Road (route 20), westerly to its westernmost boundary with the Town of Sudbury [parcel numbers omitted], and as shown on" a plan dated September 16, 1999, on file in the Town Clerk's office. Section 198-1503.1 provides that a "wireless communications facility may be erected in the [WCSD] upon the issuance of a special permit by the Planning Board . . . and subject to site plan approval" if the Board finds that the adverse effects will not outweigh the benefits to the town, after consideration of seven factors. Section 1503.2 sets forth conditions for facilities "erected in said district", including a general height limitation of 55 feet (in the absence of a significant tree canopy), design requirements, setbacks and height requirements for location on BECO towers. Sections 198-1504 through 1506 establish required contents for application packages and set forth procedural requirements for approval. As the Bylaw contains no provision for a waiver, any application for a facility outside the WCSD requires a variance under Mass. Gen. Laws c. 40A, § 10.

# ARGUMENT

## I.    THE DENIAL CAUSES IRREPARABLE HARM.

Injunctive relief may issue after a district court considers the following factors: "(1) the

likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is

denied; (3) the balance of relevant impositions, i.e., the hardship to the non-movant if enjoined as

contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of

the court's ruling on the public interest." Strahan v. Coxe, 127 F.3d 155, 160 (1st Cir. 1997);

The federal interests favoring rapid deployment of wireless telecommunications

technology strongly support preliminary relief where, as here, telecommunications providers

have tried, for years, to find a way to cover a significant coverage gap within the Town.  The

TCA was designed to "encourage the rapid deployment of new telecommunications technology."

Reno v. American Civil Liberties Union, 521 U.S. 844, 857 (1997).  See Nextel Communications

of the Mid-Atlantic, Inc. v. Manchester-by-the-Sea, 115 F. Supp.2d 65, 67 (D. Mass. 2000)

(Congress intended the TCA to "provide for a pro-competitive, de-regulatory national policy

framework designed to accelerate rapidly private sector deployment of advanced

telecommunications and information technologies to all Americans")(citation omitted).[1]

> Every day that Plaintiff's special permit is denied is a day Plaintiff loses
> against its major competitors, whose antennae presently are attached to the

---

[1]    The Act reflects Congress' intent to promote competition and reduce regulation "to secure better prices and higher quality services for American telecommunications consumers and encourage rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. See Telecorp Realty, LLC v. Town of Edgartown, 81 F.Supp.2d 257, 261 (D. Mass. 2000) (citation omitted).

Tower. In today's quickly advancing world of telecommunications services, the costs of delay cannot be understated. The "balance of equities" and "public interest" factors further favor allowing the motion. In contrast to Plaintiff's potential losses, Defendants lose virtually nothing by granting the special permit, other than the effect of prohibiting Plaintiffs construction of its antennae on the Tower. ... [I]t cannot be contested that the addition of Plaintiff to the marketplace will be in the public interest. A basic premise of the TCA is "to increase competition in the telecommunications industry."

Telecorp Realty, LLC v. Town of Edgartown, 81 F.Supp.2d 257, 261 (D. Mass. 2000) (citation omitted). Cf. Cablevision of Boston, Inc. v. Public Improvement Commission, 38 F.Supp. 46, 62-3 (D. Mass.), aff'd. 184F.3d 88 (1st Cir. 1999) (loss of market share is an inseparable injury, albeit outweighed in that case by other factors). Here, the determinative factors favor issuance of the preliminary injunction ordering the defendants to permit plaintiffs to install the proposed wireless communications facility at the Site. See Independent Wireless Opp. Corporation v. Town of Charlotte, 242 F.Supp.2d 409, 415-16 (D. Vt. 2003).

As shown by the two Wysocki affidavits, every day a significant gap in coverage exists in central Wayland, resulting in degraded or interrupted service to customers, and frustration of Congress' purpose that wireless service be extended promptly throughout the nation. The gap exists in a major Boston suburb, along an important state route and well-populated side roads. The longer the Town is able to forestall a wireless communications facility in Wayland, the longer the daily harm will continue to customers and others who depend upon, or wish to use, the wireless network. The plaintiffs are also harmed in their business daily, by reduced ability to participate in the affected portion of the market. These injuries cannot be remedied by a final judgment, as nothing in the future can correct lack of sufficient coverage today. By contrast, the only harm to the defendants could be remedied, since any construction during the pendency of this case would be "at risk" in the event that a final judgment required removal of any tower.

Any temporary interest the Town might have in preventing construction during the pendency of this case is fleeting and not weighty enough to counteract the harm to the plaintiffs.

## II.    THE ZONING BYLAW AND THE BOARDS' DECISIONS VIOLATE THE TELECOMMUNICATIONS ACT

### A.    <u>The Board Has Effectively Prohibited Wireless Service</u>

Count I of the Complaint alleges a violation of the TCA's "effective prohibition" provision, which reads as follows:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof -
>
> * * *
>
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. § 332(7)(B)(ii). This claim is fact-specific and is not limited to the record before the Board. See <u>Town of Amherst, NH v. Omnipoint Communications Enterprises, Inc.</u>, 173 F.3d 9, 16 n.7 (1st Cir. 1999) ("whether the town has discriminated among carriers or created a general ban involves federal limitations on state authority, presenting issues that the district court would resolve <u>de novo</u> and for which outside evidence may be essential"). The Act's "statutory bar against regulatory prohibition is absolute, and does not anticipate any deference to local findings." <u>Cellular Telephone Company v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus</u>, 197 F. 3d 64, 71 (3d Cir. 1999). Accord, <u>National Tower v. Plainville Board of Appeals</u>, 297 F.3d 14, 22 (1st Cir. 2002) ("without any deference to the board"). The "ultimate question of course remains whether a given decision, ordinance, or policy amounts to an effective prohibition on the delivery of wireless services. Inquiries into the existence and type of gap are merely helpful analytic tools toward that end." <u>Second Generation Properties</u>, 313 F.3d at 631-632.

### i.    There is a Coverage Gap

The Town cannot seriously dispute the significance of the coverage gap at issue here, which it conceded in <u>Nextel Communications of the Mid-Atlantic, Inc. v. Town of Wayland</u>, 231 F.Supp. 2d 396, 408 (D. Mass. 2002) 231 F.Supp. 2d at 408.  The record before the Board established without dispute that (1) there is a gap in coverage in the residential areas near Route 20 and (2) there is a gap in the entire area, including Route 20, based upon a signal strength of -85dBm, which both experts acknowledged to be the standard for in-building suburban coverage. See Plaintiffs' Substantial Evidence Memorandum, p. 7.  Subsequent facts confirm these conclusions and demonstrate a gap on Route 20 even at the -95 dBm level.  AT&T Wireless' drive test in September 2004 (Wysocki Aff. ¶¶ 38-43) documents the gap in -95dBm coverage, as shown by the computer generated evidence and expert testimony.

The Second Wysocki Affidavit, Ex. 2 and explanatory text, confirms the existence of a gap as to the Cingular frequency and system, as well as the Combined Network.  The Cingular network uses a standard of -82 dBm for the area in question, reflecting the need for in-building suburban coverage in this residential area of Wayland.  Second Wysocki Aff. ¶ 11 and Exhibit 3. At that level, there is a gap between 1.2 and 1.3 miles on Route 20, consistent with the views of the Town's expert, David Maxson, that the gap would be wider based upon the "likely future standard" for in-building coverage.  <u>Id</u>. Certified Administrative Record ("A.") 1214, 1219-1220, 1956 [Tr. 110 to 111].  Even Maxson's impromptu measurements show numerous areas along Route 20 falling below the -85dBm level.  A. 1236

The Wysocki affidavits also confirm the high volume of users exists on Route 20 and surrounding neighborhoods and roads.  The quantity and location of these uncovered roads and buildings are important factors in proving a significant, prohibitive coverage gap, where here the

gap "straddles a significant commuter highway" not just a "small residential cul-de-sac," and (b)

"covers a well-traveled road [that] could affect large numbers of travelers - - and the people who

are trying to communicate with them." Ho-Ho-Kus at 69 & n.2; Lincoln, 107 F.Supp. at 119; See

National Tower v. Plainville Zoning Board of Appeals, 164 F. Supp.2d 185 188 n.1, aff'd on

other grounds, 297 F.3d 14 (1st Cir. 2002); Charette, 242 F.Supp. at 418. The dense population in

this Boston suburb, along with the traffic on and near a state-numbered route, easily meet this

test. See Wysocki Aff. ¶¶ 52-56 . "The argument that no tower is needed is unavailable to the

town." National Tower, 297 F.3d at 19. See Second Generation Properties, L.P. v. Town of

Pelham, 313 F.3d 620, 629 (1st Cir. 2002). Denial of a tower to fill this gap violates the effective

prohibition provision in three independent ways.

           ii.    *Further Efforts in Wayland Would be Fruitless*

       Given a significant gap, the First Circuit has held that one way a wireless carrier may

prove an effective prohibition of service is to show that it has sought permission to build a facility

to serve the gap, "but [proves] that further reasonable efforts are so likely to be fruitless that it is a

waste of time even to try." Amherst, 173 F.3d at 14, quoted in Second Generation, 313 F.3d at

629. In National Tower, 297 F.3d at 24-25, the Court found the Amherst test met where "the only

fair inference from the board's words and actions in this case is that whether or not there is a

coverage gap, and whether or not there are alternative sites that could fill that coverage gap, the

board is not prepared to permit construction on Omnipoint's chosen site."

       This District has held that further applications to this very same Board would be fruitless.

(commenting on the Town's "hostile" attitude toward wireless communications facilities since

Nextel's first application, in 1994, and concluding "[u]nder the Telecommunications Act, the

Board cannot deny the variance if in doing so it would have the effect of prohibiting wireless

services"). The Wayland Court's discussion of the facts in that case (at pp. 407) addresses the same facts and applies here.

> First, it is undisputed that, in 1994, the Town denied Nextel authorization to construct a monopole antenna tower. After this first denial, Nextel obtained permission from BECO to attach antennas to BECO 111 and filed an application with the Wayland Planning Board for review of the proposed facility. Before Nextel could receive approval, the Town enacted a twelve-month moratorium. This twelve-month moratorium was disapproved by the Attorney General and the Town then enacted a six-month moratorium. The Town further delayed Nextel's attempt to build the tower when it repealed and modified its zoning by-law provisions three times...Also, when Nextel filed the application for variance (in response to the Town's concerns that the ANR did not allow all components of the still-pending original application) the Town further delayed Nextel by holding five public hearings stretching over eight months.

AT&T Wireless' experience at virtually the same location began in approximately 1998, when it worked to site its facility at the neighboring electric transmission tower, known as BECO Tower No. 112. Wysocki Aff. ¶¶ 70-73. At the time AT&T Wireless proposed the Tower 112 facility (to be collocated with a proposed facility of Omnipoint Communications, now T-Mobile), it relied on an exemption to the Wayland Wireless Communications Services District Bylaw, the stated purpose of which was to "Encourage Use of Boston Edison Company Transmission Towers for Wireless Communications Facilities" (as the title of the Article states). Id. ¶ 70. Wayland citizens[5] and/or the Town of Wayland then attempted to stop the construction of the proposed facility by (1) Initiating and passing the same one-year Moratorium and revised Wireless Bylaw just discussed in Nextel; (2) Opposing AT&T Wireless' and Omnipoint's request that the Massachusetts Historical Commission make a finding of "no adverse effect" of the proposed facility on historical or archaeological resources and (3) Initiating and passing a revised delineation of the Historic District in Wayland Center to include the area of the proposed

---

[5]      Patton v. Planning Bd. of Wayland, No. MICV99-01312 (Sup. Ct. filed Oct. 4, 2001) (Dismissing neighbors' appeal of Planning Board Site Plan Approval), *appeal dismissed for lack of prosecution*, No. 01-P-1858 (Mass. App. Ct. filed Apr. 8, 2002). Patton v. Planning Bd. of Wayland, No. MICV98-3576 (Sup. Ct. filed Oct. 3, 2001) (Dismissing neighbors' appeal of Planning Board's endorsement of ANR Plan), *aff'd* 56 Mass. App. Ct. 1107,

facility. Id. ¶¶ 71-72. Ultimately, the Town's opposition succeeded, as the Massachusetts

Historical Commission issuing an "adverse effect" finding for the proposed project on BECO

Tower No. 112 on March 9, 2001, requiring AT&T Wireless to investigate "alternative project

locations, designs, engineering and access routes" to mitigate any adverse effects on the historical

and archaeological resources identified by MHC. Id. ¶ 72.

Ironically, this past history led directly to the present application for two viable alternative

sites (135 and 137 Boston Post Road) that would completely eliminate any adverse effects of

AT&T Wireless' proposed facility on the Wayland Center Historic District or the historical and

archaeological resources in the former railroad right-of-way. Id. ¶ 73.

Even without the full history of these efforts, this Court concluded in Wayland (at id.):

> Nextel has met its heavy burden of showing the Town's hostility, and therefore that any
> further efforts would be so likely to be fruitless, that it is futile even to try. The Town has
> presented no convincing arguments to the contrary.

That case concerned the Town's first eight years of obstructionism – which now have reached ten

years, as chronicled above.

Yet, in this case the Board denied AT&T Wireless' application and sent Sprint on a

fruitless quest for yet another group of BECO towers – which the Town had expressly zoned to

be outside its Wireless Communications Services District. As AT&T Wireless anticipated, Sprint

received the same refrain that the Town has given for a decade. On November 17, 2004, the

Town wrote to Sprint that its Selectmen "voted not to consent" to Sprint's proposed application

for a wireless communications facility off Plain Road on BECO stanchion #131:

> The Board [of Selectmen] felt that the location of a wireless communications facility in
> relatively close proximity to several residences would be inconsistent with the intent and
> purpose of the Town's Wireless Communications (Overlay) Service District ("WCSD") as

---

778 N.E.2d 31 (2002), *further app. rev. denied*, 438 Mass. 1106, 782 N.E.2d 516 (2003).

set forth in the Town's Zoning By-Laws. The Board encourages Sprint to find a location for its proposed facility in the WCSD. If Sprint finds a location in the WCSD, the Board stands ready to work with Sprint in that regard.

Grossman Aff., Ex. 1. The local political popularity of this obstructionism is what led Congress to enact the TCA.

The Board's citation of phantom alternatives, such as other BECO towers where wireless use violates the town's the WCSD, provides it no protection where the Board "cannot show that those [variances and] permits will be forthcoming", particularly in the face of its historic resistance to wireless facilities:

> Although the Town is correct that the requirements of additional permits do not ordinarily make alternative sites unfeasible, the Town cannot show that those permits will be forthcoming. Instead, the undisputed evidence shows repeated delays and denials that, when viewed in the aggregate, demonstrate the Town's hostility towards Nextel. Nextel, therefore, has met its burden of showing "from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Amherst, 173 F.3d at 14.

Wayland, 231 F.Supp.2d at 407.

Indeed, as one would expect, neighbors on Plain Road living near the BECO towers appeared before the Board in the parallel Sprint proceeding (for 135 Boston Post Road) to express their concerns regarding the BECO towers, even before any application for those towers had been filed. Transcript of Sprint hearing (December 14, 2004), pp. 31, 71-72 (Ms. Seldon and Ms. Reinhardt and "a lot of residents from Plain Road"), attached as Exhibit 2 to the Grossman Affidavit. The Board's Chair was quick to respond that "[i]t was not the ZBA that proposed that tower," i.e. BECO 131. Ms. Reinhardt wanted assurance that the BECO option was "dead", and, after Sprint responded, another board member observed: "dead issue." Id., p. 74. All of this confirms what AT&T Wireless concluded last summer: the other options mentioned by the Board were futile.

Retrenching from its own position in the Nextel case, the Town is now unwilling even to acknowledge any gap or need for coverage, despite the scientific evidence and multiple carriers' expression of need, strongly supports the conclusion that the Board's "actions thus far show[] an unwillingness to acknowledge a problem". See Second Generation Properties, 313 F.3d at 635. This Town's inflexible rejection of wireless communications facilities anywhere within its jurisdiction, except for useless facilities in the Wireless Communications Services District, shows "based on experience, that its regime is an effective ban." Amherst, 173 F3d. at 6.

    *iii.*    *Impossible Criteria*

Alternatively, AT&T Wireless may show that Wayland violates the effective prohibition clause where, based upon a "case-by-case determination", "the town sets or administers criteria which are impossible for any applicant to meet [citing Amherst, 173 F.3d at 14]. That was the situation in National Tower, which affirmed the district court's finding that a permit denial constituted an effective prohibition. See 297 F.3d at 23-25." Second Generation Properties, L.P. v. Town of Pelham, 313 F.3d 620, 630 (1st Cir. 2002); See also National Tower, LLC v. Plainville Zoning Board of Appeals, 297 F.3d 14, 23-25 (1st Cir. 2003). Here, the Board and Town have set forth numerous criteria that no carrier can meet.

First, the Town's bylaw prohibits wireless uses outside of the Wireless Communications Services District. Since that District contains no location that will cover the Coverage Gap (Wysocki Aff. ¶¶ 60-69), this prohibition is a prohibition of service in the Coverage Gap unless the Board grants applications for a variance. Like its neighbor, Lincoln, the Town's restrictive "Overlay District" and Board decisions violate the TCA because (a) it is impossible to provide coverage from the only zoning district allowed under the local bylaw, and (b) the Board denied an otherwise unobjectionable application to build outside that district. Omnipoint

Communications MB Operations, LLC v. Town of Lincoln, 107 F.Supp. 2d 108, 117 (D. Mass. 2000) (invalidating wireless overlay bylaw that limited wireless facilities to areas that could not cover the whole town), cited in Nat' Tower, 297 F.3d at 20.

Indeed, the Board's new-found position that there is no coverage gap, means that the Board will not permit any carrier to cover this area. If the Town will not even recognize the coverage gap, there is no prospect of obtaining a variance at any location outside the Wireless Communications Services District, because the Town refuses to acknowledge the need.

  iv.  *Full Evaluation of Alternatives*

Finally, AT&T Wireless may show effective prohibition due to denial of its application by making "a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the other alternatives are not feasible to serve its customers." Southwestern Bell, 244 F.3d at 63. This showing is, as the First Circuit has suggested, "sufficient to support an allegation that the zoning board permit denial effectively prohibits personal wireless services in the area." Id. Omnipoint Communications MB Operations, LLC, v. Town of Lincoln, 107 F. Supp.2d 108, 116-120 (D. Mass. 2000). See also Town of Amherst, New Hampshire v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 14 & n. 4 (1st Cir. 1999). Here, AT&T Wireless has investigated over 50 alternate locations both on municipal and private property, in residential and non-residential zones. A. 1962-1968 [Tr. 135-159]; Dwight/Hesse Aff. None meets the coverage need in a manner that comports with the Town's bylaw and expressed insistence upon locations pre-approved by that bylaw. Coverage from the WCSD is not feasible. Wysocki Aff. ¶¶ 60-69. The Board suggested that Sprint investigate still other BECO towers, an investigation AT&T correctly believed to be fruitless, as later shown by the Town Selectmen rejection of Sprint's attempts.

-13-

In sum, Wayland has denied six attempts for wireless facilities to cover the relevant area –

four by permit denial (Nextel monopole, Boston Edison Co. ("BECO") Tower No. 111, 135 Old

Post Road and 137 Old Post Road), one through historic district laws (BECO No. 112), and one

by denial of access to Town property (BECO 131). AT&T Wireless and other carriers have thus

made "successive applications," which the Town has denied "without giving any clue of what will

do the trick." Amherst, 173 F.3d at 17. AT&T Wireless and Sprint submitted a review of

approximately 56 separate parcels (in addition to the BECO towers). See Town of Amherst, New

Hampshire v. Omnipoint Communications Enter., Inc., 173 F.3d 9, 17 (1st Cir.1999)("Nor in the

face of a vigilant district court, can the town exhaust applicants by requiring successive

applications without giving any clue of what will do the trick.").

## B.    The Board Violated the Act's Substantial Evidence Provisions

The plaintiffs rely upon and incorporate their Substantial Evidence Memo, which shows a

likelihood of success in showing that Wayland violated the requirement that any decision by a

municipality regarding personal wireless service facilities "shall be . . . supported by substantial

evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). See Second Generation

Properties v. Town of Pelham, 313 F.3d 620, 627 (1st Cir. 2002); Manchester, 115 F.Supp. 2d at

66.[2]

---

[2]    The Act imposed these limitations because, despite the growing popularity of personal wireless services, land use applications for such facilities were often subject to interminable delays and denied for pretextual reasons, a situation which threatened to thwart the development of the facility networks necessary for efficient utilization of the frequencies dedicated to personal wireless services. See H.R. Rep. No. 104-204, at 94, reprinted in 1996 Code Cong. & Admin. News, at 61. Accordingly, in the Act, Congress sought to preserve a role for local authorities in siting personal wireless facilities while ensuring that parochial interests would not frustrate national telecommunications policy. See H.R. No. 104-204, at 94, reprinted in 1996 Code Cong. & Admin. News, at 61 ("Such requirements will ensure an appropriate balance in policy and will speed deployment and the availability of competitive wireless telecommunications services which ultimately will provide consumers with lower costs as well as with a greater range and options for such services.").

-14-

III.    **THE PROPER REMEDY IS AN ORDER TO ISSUE THE REQUESTED ZONING RELIEF**

AT&T Wireless also incorporates the discussion of remedy in the Plaintiff's Substantial Evidence Memorandum.[9]

## CONCLUSION

For the foregoing reasons, the Court should grant the plaintiffs' motion for preliminary injunction and order that the plaintiffs be permitted immediately to install their facilities at the Site.

By its attorneys,

Stephen D. Anderson, Esq. (BBO # 018700)
Douglas H. Wilkins, Esq. (BBO # 528000)
Brian S. Grossman, Esq. (BBO # 641159)
ANDERSON & KREIGER LLP
43 Thorndike Street
Cambridge, MA 02141
(617) 252-6575

---

[9]      In resolving such appeals under the Act, federal courts (including this Court) have frequently ordered the issuance of the requested permits on the grounds that such relief best serves the Act's stated goal of expediting resolution of these types of actions and that remand to the Board would serve no useful purpose. See Town of Amherst, NH v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9 (1st Cir. 1999); Omnipoint Communications MB Operations, LLC, v. Town of Lincoln, 107 F.Supp.2d 108 (D.Mass. 2000); Telecorp Realty, LLC v. Town of Edgartown, 81 F.Supp.2d 257, 261 (D.Mass. 2000); Cellco Partnership v. Town of Douglas, 81 F.Supp.2d 170, 175 (D.Mass. 1999); Sprint Spectrum L.P. v. Town of Easton, 982 F.Supp. 47, 52 (D.Mass. 1997).

Dated: April 15, 2005

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing on the defendants by causing a copy to be mailed to their counsel of record listed below on this 19th day of April, 2005.

Brian S. Grossman, Esq.

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(a)(2), I certify that I conferred by phone with Patricia Cantor on April 12, 2005 and April 14, 2005 in a good faith attempt to resolve or review the issues raised in this Motion.

_____
Douglas H. Wilkins

g:\docs\att\waylandeasternlit\p\pimemo.doc

-16-