| Site ID | RAD Center (ft.) | Latitude | Longitude | Site Name | Site Address | City | State | Status |
|---|---|---|---|---|---|---|---|---|
| 323 | 75 | 42.452222 | -71.375556 | Emerson Hospital | RT 2 | Concord | MA | On Air |
| 912002004A01 | 85 | 42.471100000 | -71.339900000 | Downtown Concord | 509 Bedford Street, MA 01742 | Concord | MA | Proposed |
| 912002018A01 | 95 | 42.450092000 | -71.321381000 | Concord Mobil Station | 22 Concord Turnpike/Rte 2, Concord, MA 01724 | Concord | MA | On Air |
| 912002019A01 | 68 | 42.477500000 | -71.394722000 | Annursnac Hill | 40Y, Annursnac Hill Road | Concord | MA | Proposed |
| 158 | 75.5 | 42.295833 | -71.474444 | Edgewater Hills Apartments | 1640 Worcester | Framingham | MA | On Air |
| 159 | 101.7 | 42.307222 | -71.392222 | Meditech Framingham | 550 Cochituate Road | Framingham | MA | On Air |
| 160 | 32.8 | 42.311667 | -71.392444 | Framing Service Area | Westbound on MassPike, between exits 13, 12 | Framingham | MA | On Air |
| 161 | 52.5 | 42.29805556 | -71.41527778 | Crown Building | 463 Worcester Rd. | Framingham | MA | On Air |
| 344 | 118 | 42.3465 | -71.4521111 | Nobscot Hill AT&T | Brimstone Lane | Framingham | MA | On Air |
| 350 | 79 | 42.326667 | -71.386667 | Bost Edison @ Riverpath | Old Connecticut Path | Framingham | MA | On Air |
| 657 | 82 | 42.28083333 | -71.41805556 | Grace Cong Church | 73 Union Avenue | Framingham | MA | On Air |
| 658 | 79 | 42.29729222 | -71.45222222 | Oak Terrace Condo | 1321 Worcester Rd. | Framingham | MA | On Air |
| 48 | 59 | 42.444722 | -71.263889 | One Cranberry Hill | 750 Marrett Road | Lexington | MA | On Air |
| 194 | 90 | 42.422222 | -71.255556 | Stride-Rite | 191 Spring Street | Lexington | MA | On Air |
| 310 | 80 | 42.45269444 | -71.26122222 | BECO Lexington | Wood St | Lexington | MA | Proposed(Alt) |
| 912002005B01(Alt) | 90 | 42.41277800 | -71.32527800 | DPW Site - Verizon | Lewis Street, Lincoln, MA | Lincoln | MA | Proposed |
| Cingular Pub. Safety | 95 | 42.41375000 | -71.32986100 | Cingular Public Safety Monopole | 169 Lincoln Street | Lincoln | MA | Proposed(Alt) |
| 912002020A01(Alt) | 80 | 42.41361000 | -71.32969500 | 110 Concord Road / Eastern (McCart) | 110 Concord Road | Lincoln | MA | Proposed(Alt) |
| 912002016A04(Alt) | 50 | 42.42738000 | -71.30369400 | Bemis Hall | 15 Bedford, Lincoln, MA | Lincoln | MA | Proposed |
| Decordova Museum | 65 | 42.49089000 | -71.31148300 | Decordova Museum | Sandy Pond Road | Lincoln | MA | On Air |
| 326 | 70 | 42.440278 | -71.3 | Tracey's Service Station | 131 Cambridge St | Lincoln | MA | On Air |
| 321 | 187 | 42.43038889 | -71.45405556 | Clock Tower Place | 146 Main St | Maynard | MA | On Air |
| 163 | 125 | 42.316111 | -71.3525 | Mitchell Property | 70 Pine Street | Natick | MA | On Air |
| 250 | 59 | 42.3025 | -71.356833 | Whitney Place | 721 Worcester Street | Natick | MA | On Air |
| 655 | 131.2 | 42.28405 | -71.34694722 | First Congregational | 2 Main Street | Natick | MA | On Air |
| 656 | 131.2 | 42.28194444 | -71.3825 | BECO Natick | West Central Street | Natick | MA | On Air |
| 214 | 78 | 42.33425 | -71.25427778 | Newton Holiday Inn | 399 Grove Street | Newton | MA | On Air |
| 37 | 115 | 42.347778 | -71.235 | Auburndale Tower | 1354 WashingtonStreet | W. Newton | MA | On Air |
| 249 | 67 | 42.32659167 | -71.23101111 | Waban Hardware | 1643 Beacon St | Newton | MA | On Air |
| 672 | 89 | 42.240833 | -71.3703833 | Sherbom Parish Church | 11 Washington Street | Sherborn | MA | On Air |
| 330 | 78 | 42.402772 | -71.43361 | Willis Hill Water Tank | Maynard Rd. | Sudbury | MA | On Air |
| 331 | 121 | 42.420833 | -71.393096 | Cummings Property | 142 North Road | Sudbury | MA | On Air |
| 345 | 145 | 42.363858 | -71.383947 | Sudbury Landfill | Boston Post Road | Sudbury | MA | On Air |
| 51 | 69 | 42.38027778 | -71.2675 | Bear Hill Tower | 148 Bear Hill Road | Waltham | MA | On Air |
| 333 | 55 | 42.40747222 | -71.27663489 | Bay Colony | 1050 Winter Street | Waltham | MA | On Air |
| E217 | 110 | 42.398989 | -71.24 | Pinnacle Towers | 15 Sachem Street | Waltham | MA | On Air |
| 912002105A02 | 70 | 42.375568 | -71.237158 | Sovereign Bank | One Moody Street | Waltham | MA | On Air |
| 912021315A02 | 147 | 42.362469 | -71.267333 | Parametrics - Waltham | 128 Technology Park Drive | Waltham | MA | Proposed |
| 912002010A01 | 80 | 42.37806000 | -71.35805600 | Peace Lutheran Church | 107 Concord Street | Waltham | MA | Proposed |
| 912002014A01 | 85 | 42.36019000 | -71.34464400 | Sprint Weyland(Classic Clocks) | 135 Boston Post Rd, Wayland, MA | Wayland | MA | Proposed |
| Eastern Tower (Alt) | 120 | 42.36043300 | -71.34615000 | Eastern Tower site | 137 Boston Post Rd, Wayland, MA | Wayland | MA | Proposed(Alt) |
| E340 (Alt) | 95 | 42.36408300 | -71.36438900 | NSTAR Tower No. 112 | | Wayland | MA | Proposed(Alt) |
| 52 | 63 | 42.32444444 | -71.2525 | 62 Walnut | 62 Walnut Street | Wellesley | MA | On Air |
| 162 | 98.4 | 42.303611 | -71.324722 | Wellesley Motor Inn | 978 Worcester Street | Wellesley | MA | On Air |
| 167 | 72 | 42.31222222 | -71.26361111 | Mass Bay Community | 50 Oakland Street | Wellesley | MA | On Air |
| 168 | 138 | 42.29583333 | -71.29361111 | Wellesley Congregational | 2 Central Street | Wellesley | MA | On Air |
| 166 | 72 | 42.335278 | -71.316399 | Wightman Tennis Ct | 100 Brown Street | Weston | MA | On Air |
| 912002021AXX | 60 | 42.39928000 | -71.30231000 | Weston Site / Evergreen | Rte 117, Weston, 1/2 mile from Lincoln Border, MA | Weston | MA | Proposed (TBD) |
| 912002022A05 | 87 | 42.36383000 | -71.30780600 | Weston Police Station | 180 Boston Post Road | Weston | MA | Proposed |

Site Legend
- Proposed Site
- Neighboring Sites

Coverage Contour Legend
- Proposed Site
  Coverage (-95dBm)
- Neighboring Sites
  Coverage(-95dBm)

AWS facilities in 5 miles from
town of Wayland Border

SANDEEP GOYAL

MAY 05 2003

AT&T WIRELESS SERVICES

Case 1:05-cv-11016-WGY    Document 36-2    Filed 04/30/2006    Page 3 of 43



# Site Legend
- **Proposed Site**
- **Neighboring Site**
- **Alternate sites**

# Coverage Contour Legend
- **Proposed Site**
  Coverage (-95dBm)
- **Neighboring Sites**
  Coverage(-95dBm)

SANDEEP GOYAL

APRIL 07 2003

135 Boston Post Road, Wayland, MA

AT&T WIRELESS SERVICES



Coverage Contour Legend
- Proposed Site
  Coverage (-95dBm)
- Neighboring Sites
  Coverage(-95dBm)

Eastern tower site, Wayland, MA
Antenna Mounting Height 120'

SANDEEP GOYAL

MAY 05 2003

Site Legend
- Proposed Site
- Neighboring Sites
- Alternate Sites

AT&T
WIRELESS SERVICES



AT&T
WIRELESS SERVICES

## Coverage Contour Legend

- Proposed Site
- Coverage (-95dBm)
- Neighboring Sites
- Coverage(-95dBm)

135 Boston Post Road, Wayland, MA
Antenna Mounting Height 110'

SANDEEP GOYAL

MAY 05 2003

## Site Legend

- Proposed Site
- Neighboring Sites
- Alternate Sites



## Coverage Contour Legend
- Proposed Site
  Coverage (-95dBm)
- Neighboring Sites
  Coverage(-95dBm)

## Site Legend
▼ - Proposed Site
▼ - Neighboring Sites
▼ - Alternate Sites

**AT&T**
WIRELESS SERVICES

Eastern tower site, Wayland, MA
Antenna Mounting Height 55'

SANDEEP GOYAL

MAY 05 2003



## Coverage Contour Legend

- Proposed Site
- Coverage (-95dBm)
- Neighboring Sites
- Coverage(-95dBm)

**135 Boston Post Road, Wayland, MA**
**Antenna Mounting Height: 45'**

## Site Legend

- Proposed Site
- Neighboring Sites
- Alternate sites

**SANDEEP GOYAL**

**APRIL 07 2003**

AT&T WIRELESS SERVICES

April 2001–September 2002     AT&T Wireless            Nashua, NH

**Sr. Planning Engineer**

- Regional 3G RF Liaison tasked with supporting local RF teams and serving as a point of contact for the national RF team, monitoring project activities, and providing technical guidance, regional coordination and information exchange.
- Project Leader on Logan International Airport. Responsible for monitoring and providing guidance to turn-key vendors (Bechtel, Andrew) and securing dark fiber connectivity. Completed vendor bid process and provided a recommendation to management for final decision.
- Generated technical recommendations and RF best practices

1996–April 2001     AT&T Wireless Services           Westwood, MA

**Lead RF Design Engineer / Sr. RF Engineer**

- Provided approval for site design and placement of macrocells, in-building RF distribution systems, microcells, and repeater systems
- Provided leadership and supervision to team of four Design Engineers
- Worked closely with System Development Manager, construction, legal, and site acquisition team to solve construction, zoning, and leasing issues.
- Responsible for regulatory compliance for New England market including E-911, FAA, FCC, and Massachusetts Department of Public Health filings.
- Part of original design team for Boston/Providence market build
- Designed, built, and tested in excess of 75 cell sites
- Provided expert testimony in numerous public hearings

1994–1996           Ameritech Cellular Services      Schaumberg, IL

**System Performance Engineer**

- Responsible for network performance of the core area of Ameritech's Chicago network. Including integrating numerous macrocells and microcells into the system, customer complaint resolution, and system troubleshooting
- Served on team to prepare cellular network for 1996 Democratic National Convention
- Worked on 5ESS switch integration, cell rehomes, and CDPD deployment
- Part of first office application testing team of 8 and 11 KB Lucent CDMA voice coders
- Worked with internal security, customer service, and law enforcement to reduce subscriber fraud and customer phone cloning

**Education**

- 1990–1994        **Michigan Technological University**      Houghton, MI
- B.Sc., Electrical Engineering, Communications Option
- Graduated Cum Laude

**Training**

- Ericsson and Lucent networks, expert witness training, graduate course work in Fiber Optics and Electromagnetic Theory, CellCAD and Planet propagation tools, Managing Lawfully, Managing Change, Behavioral Interviewing, Managing the Empowered Employee



# AT&T Wireless
## Wayland Area - Call Data

**Proposed location**

**Wayland_Phone_Data Rx_Level**
Collected 09/27/04

● -75 to -30 dBm

-95 to -76 dBm

● -99 to -96 dBm

● -120 to -100 dBm



# AT&T Wireless
## Wayland Area - Scanner Data

Proposed location

**Wayland_Scanned_RxLev**
Collected 09/27/04

● -75 to -30 dBm
  -95 to -76 dBm
● -99 to -96 dBm
● -120 to -100 dBm



BusinessObjects - Drop-counters_cell - [joeander]

File  Edit  View  Insert  Format  Tools  Data  Analysis  Window  Help

**DROPS**

MA0051C

| Time (Date) | Total Seizures | TNDROP | TDISS | TDISQA | TDISTA | TSUD LOS | Drops Other | TDISS DL | TDISS UL | TDISS BL | TDISQA DL | TDISQA UL | TDISQA BL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/13/2004 | 1668 | 50 | 48 | 0 | 0 | 2 | 0 | 3 | 0 | 45 | 0 | 0 | 0 |
| 9/14/2004 | 1729 | 63 | 63 | 0 | 0 | 0 | 0 | 6 | 2 | 55 | 0 | 0 | 0 |
| 9/15/2004 | 1969 | 52 | 52 | 0 | 0 | 0 | 0 | 3 | 0 | 49 | 0 | 0 | 0 |
| 9/16/2004 | 1415 | 65 | 65 | 0 | 0 | 0 | 0 | 3 | 1 | 61 | 0 | 0 | 0 |
| 9/17/2004 | 1476 | 49 | 48 | 0 | 0 | 1 | 0 | 3 | 0 | 45 | 0 | 0 | 0 |
| 9/18/2004 | 1095 | 33 | 31 | 1 | 0 | 1 | 0 | 0 | 0 | 31 | 1 | 0 | 0 |
| 9/19/2004 | 1048 | 27 | 27 | 0 | 0 | 0 | 0 | 1 | 1 | 25 | 0 | 0 | 0 |
| 9/20/2004 | 1380 | 51 | 50 | 0 | 0 | 1 | 0 | 2 | 0 | 48 | 0 | 0 | 0 |
| 9/21/2004 | 1837 | 63 | 62 | 0 | 0 | 1 | 0 | 4 | 0 | 58 | 0 | 0 | 0 |
| 9/22/2004 | 1866 | 61 | 57 | 3 | 0 | 1 | 0 | 1 | 1 | 55 | 3 | 0 | 0 |
| 9/23/2004 | 1950 | 64 | 59 | 4 | 0 | 1 | 0 | 1 | 0 | 58 | 4 | 0 | 0 |
| 9/24/2004 | 1768 | 67 | 67 | 0 | 0 | 0 | 0 | 5 | 0 | 62 | 0 | 0 | 0 |
| 9/25/2004 | 2080 | 56 | 54 | 0 | 0 | 2 | 0 | 4 | 0 | 50 | 0 | 0 | 0 |
| 9/26/2004 | 1118 | 20 | 19 | 0 | 0 | 1 | 0 | 0 | 0 | 19 | 0 | 0 | 0 |
| 9/27/2004 | 1607 | 52 | 48 | 0 | 0 | 3 | 1 | 2 | 0 | 46 | 0 | 0 | 0 |
| 9/28/2004 | 1482 | 64 | 62 | 1 | 0 | 0 | 1 | 4 | 1 | 57 | 1 | 0 | 0 |

Report1

Last Exec: 9/29/2004  02:45 PM       NUM

Start       2:52 PM



**DROPS**

**MA0345B**

| Time (Date) | Total Seizures | TNDROP | TDISS | TDISQA | TDISTA | TSUD LOS | Drops Other | TDISS DL | TDISS UL | TDISS BL | TDISQA DL | TDISQA UL | TDISQA BL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/13/2004 | 1591 | 37 | 34 | 0 | 0 | 1 | 2 | 1 | 0 | 33 | 0 | 0 | 0 |
| 9/14/2004 | 1910 | 51 | 48 | 1 | 0 | 1 | 1 | 4 | 1 | 43 | 0 | 1 | 0 |
| 9/15/2004 | 1861 | 55 | 54 | 1 | 0 | 0 | 0 | 3 | 1 | 50 | 0 | 1 | 0 |
| 9/16/2004 | 1517 | 59 | 58 | 0 | 0 | 1 | 0 | 1 | 2 | 55 | 0 | 0 | 0 |
| 9/17/2004 | 1881 | 57 | 54 | 0 | 0 | 3 | 0 | 3 | 0 | 51 | 0 | 0 | 0 |
| 9/18/2004 | 1130 | 30 | 30 | 0 | 0 | 0 | 0 | 0 | 2 | 28 | 0 | 0 | 0 |
| 9/19/2004 | 1027 | 33 | 32 | 0 | 0 | 1 | 0 | 0 | 2 | 30 | 0 | 0 | 0 |
| 9/20/2004 | 1364 | 40 | 34 | 0 | 0 | 5 | 1 | 2 | 4 | 28 | 0 | 0 | 0 |
| 9/21/2004 | 1623 | 52 | 50 | 0 | 0 | 2 | 0 | 1 | 1 | 48 | 0 | 0 | 0 |
| 9/22/2004 | 1807 | 53 | 51 | 0 | 0 | 2 | 0 | 3 | 0 | 48 | 0 | 0 | 0 |
| 9/23/2004 | 2042 | 65 | 64 | 0 | 0 | 1 | 0 | 3 | 0 | 61 | 0 | 0 | 0 |
| 9/24/2004 | 2156 | 80 | 74 | 0 | 0 | 6 | 0 | 2 | 0 | 72 | 0 | 0 | 0 |
| 9/25/2004 | 1346 | 41 | 39 | 0 | 0 | 2 | 0 | 1 | 1 | 37 | 0 | 0 | 0 |
| 9/26/2004 | 1228 | 27 | 26 | 0 | 0 | 0 | 1 | 0 | 0 | 26 | 0 | 0 | 0 |
| 9/27/2004 | 1534 | 47 | 42 | 0 | 0 | 2 | 3 | 2 | 1 | 39 | 0 | 0 | 0 |
| 9/28/2004 | 1530 | 56 | 50 | 1 | 0 | 2 | 3 | 1 | 0 | 49 | 0 | 1 | 0 |



# Broadcast Signal Lab

### Review of AT&T Wireless Application for
### a Wireless Service Facility at 135 Boston Post Road Wayland, Massachusetts

## Introduction

Broadcast Signal Lab, LLP was engaged by the Town of Wayland, Massachusetts Zoning Board of Appeals (ZBA) to review the applications for a personal wireless service facility at 135 and 137 Boston Post Road. The application for 135 Boston Post Road is on hold at the election of that applicant, Sprint, Spectrum. This report focuses on the 137 Boston Post Road applications by Eastern Towers with AT&T Wireless as a co-applicant. Sprint is also a co-applicant at this site, however their active pursuit of the site is on hiatus as they examine an alternative possibility of occupying an existing structure.

The applicants have submitted information to the record intended to substantiate their need for and the intended use of the proposed facility. The proposed facility is a monopole tower of 120 feet height above ground with a concealed-antenna design in which the antennas and appurtenant cables are enclosed within a continuous cylindrical surface. It is to be located in a residential district and is not within the Wayland Wireless Communications Services District.

It is fitting, then to discuss the following topics.

1. Is there a need for additional coverage for AT&T Wireless?
2. What is the capability of the Overlay District to support the fulfilling of that need?
3. What are the capabilities at the proposed site?
4. What alternatives exist?

## Summary

My analysis is based on an assumption about the manner in which the ZBA will decide on the application. If the ZBA determines that it is able to render a favorable decision under the variance rules of Chapter 40A of Massachusetts general laws, then the information discussed below can be employed to consider the question of hardship for the applicant(s). If the ZBA determines that it is unable or unwilling to render a favorable decision on variances, then the question of the Telecommunications Act of 1996 comes into play. The applicants suggest in their submittals that if a prohibition of service would be created by disapproval of the application that the ZBA has a duty under the TCA to grant the applicants relief.

To determine whether a prohibition of service would occur, I understand that one must have a gap in service that is significant and that cannot reasonably be fulfilled by an alternative. Advice of counsel is recommended on interpreting the ZBA's obligations under the TCA.

Broadcast Signal Lab, LLP
503 Main Street
Medfield, MA 02052
508 359 8833

**Broadcast Signal Lab**                    **137 Boston Post Road, Eastern Towers, AT&T Wireless**

Gap?

In summary, it is my opinion that there is a gap in AT&T service along Route 20 in the vicinity of the proposed facility. The extent of that gap is uncertain because there has been no drive test to corroborate the actual signal levels present in the area and the signal levels that would result from the proposed facility and the soon-to-be-constructed Weston facility to the east. Consequently, it is not clear that the 120-foot height is absolutely necessary at the proposed site. It appears that a height of, say, 70 feet would provide one carrier with a substantial amount of coverage in the target area. There is no certainty that the height of 120 feet would provide reliable continuous communication to the coverage from the Weston facility under construction; so both the 70-foot and 120-foot heights appear to require an additional facility near the Weston-Wayland line in the future, rendering the 120-foot height less than necessary.

Significance?

The significance of the gap relates to its relative size and to its impact on the use of the service. The gap could be as little as ½ mile and as much as a mile and a half in length along Route 20, depending on what signal level threshold actually applies to the measure of "significant" and the degree to which the signals from the Sudbury-Wayland line provide coverage, despite what the AT&T computer-estimated plots show. The applicants suggest their state traffic statistics substantiate the significance of service interruptions in the area.

Viable Alternatives?

If the ZBA decides there is a significant gap that would be served by the proposed facility, it apparently must then decide whether a prohibition of service would result if the facility were not permitted. A prohibition of service would occur if there were no alternatives or if it would be fruitless to try to develop them. (Seek legal counsel on interpretations of the TCA- these issues are raised here to only organize the technical discussion.)

The existing facility on the Sudbury-Wayland line, or a new facility nearby in the Wayland Wireless Communications District are the first options to consider. Our analysis of the coverage from the Nextel case suggests there is a radio line of sight to a segment of Route 20 in eastern Wayland and therefore a potentially usable signal there, under 2.5 miles distant. While the propagation of Nextel's frequencies and the PCS frequencies of AT&T and Sprint differ somewhat, my drive-test in the Nextel case (and submitted to the record by others) suggests that even allowing for several dB additional loss at the PCS frequencies a usable PCS signal should appear on a segment of Route 20 east of the proposed facility. This is not shown in the AT&T plots. Nevertheless, coverage from the Sudbury-Wayland line will not fulfill the entire segment of Route 20 in eastern Wayland. However, in conjunction with this coverage a lower, less intrusive facility or facilities might be all that is necessary to complete service in the area.

2

AT&T says some electrical transmission towers in the area could provide satisfactory coverage, but casts doubt on the developability of the sites for various reasons. Without further diligence on the possibilities, it might be premature to rule out these existing tall structures on the basis of a first-blush analysis of viability. Indeed, Sprint is sufficiently encouraged by the possibilities at the electrical transmission towers that it has put its application on hold to perform due diligence on them. Thus, from the present standpoint, there might be sufficient potential demonstrated in the electrical transmission towers to consider them viable options. Nationwide, planning agencies and local bylaws/ordinances strongly encourage the use of existing structures to support wireless communications, leaving new tower construction as a last resort. Wayland does too. For this reason, the possible use of the electrical transmission towers might deserve the opportunity to be explored.

The possibility of a Distributed Antenna System (DAS) came up in discussion. AT&T plans to install such a system on Nantucket, a town which, like Wayland, is notorious for guarding its environmental character. AT&T could propose a DAS along eastern Route 20. While there are potential roadblocks in the negotiation and approval of pole rights, it is a possibility that remains unexplored.

The Sprint proposal for 135 Boston Post Road is another viable alternative, in that it is leased and under application. It is unfortunate that these two mutually exclusive applications are not continuing to be heard at once. However, there may be sufficient evidence on the joint record to render an opinion about the viability of the Sprint facility from a zoning perspective. That is, if the proposed facility at 137 Boston Post Road is more in keeping with the spirit of the Zoning Bylaw than 135, then a disapproval of the 137 application on the basis of insufficient compliance with the spirit of the Bylaw suggests that a similar decision might occur for the Sprint application at 135. After discussing this, the ZBA might decide whether the proposed facility at 135 is more, less, or equally viable as the proposed facility at 137. If 135 is determined to remain viable under the circumstances, then it becomes one of the viable alternatives that precludes a prohibition of service in the event of a denial of 137.

Finally, the ZBA might be satisfied by the showings made by the applicants regarding the search for other parcels for a tower. On the other hand, the conditions under which offers were tendered and declined can be tenuous. The original proposal for a 120-foot tower may be a harder sell than, say, an 80-foot tower. Proposals tendered just to show an attempt to consider alternatives, if any, may have been half-hearted. Suitable parcels may have been inadvertently overlooked due to a lack of local knowledge or creativity. The ZBA should consider how much weight the applicants' documented efforts to find available parcels should be given in assessing the possibility of better parcels in the area being available.

3

**Broadcast Signal Lab**                    **137 Boston Post Road, Eastern Towers, AT&T Wireless**

The viability of alternatives should be considered in light of the TCA and advice of counsel is recommended to help distinguish the fine line between a viable site and an unviable one, a potentially fruitful pursuit and a fruitless one.

<u>Summary Conclusion</u>

The ZBA should determine whether the proposed facility is the only way to resolve any area it considers to be a significant gap. Lower heights or alternative locations should be considered to determine if any are viable enough to pursue and if they are less objectionable in light of the community interest.

**Detailed Discussion**

AT&T has submitted signal strength predictions prepared by computer. The computer model is generically "tuned" for the region based on previous field measurements at other sites (drive tests). In situations where there exists what I refer to as a "close call," a drive test of the actual site or sites in question removes uncertainty about that close call situation. One such close call will be discussed further below. Mr. Goyal of AT&T testified October 21, 2003 (p.37), "some of the towns ask for the drive test, and we show them the prediction and the drive test." AT&T's response to my written questions contradicted this, indicating "a site-specific drive test was not necessary..." and that "It would be irrational for a qualified RF expert to conclude otherwise."

On the contrary, it is quite rational to seek a drive test in this matter. Evaluating the need for the facility, its height, and its location requires a careful assessment of the "close call" situations in network design. AT&T insists the proposed height is necessary, and states that the colored overlays on the map represent good coverage while the white spaces do not. Yet even at the proposed height there remains a region of "white space" on Route 20 that represents a gap. AT&T is willing to tolerate it, apparently for a few years or more, based on testimony. When asked how AT&T distinguishes between tolerable white space and unsatisfactory white space (May 28, 2004 response, p14), AT&T responds, "When the facilities in Wayland and Weston are up and operating along Route 20, AT&T Wireless will evaluate the actual coverage from theses facilities and determine whether or not any remaining coverage deficiencies in the hand-off areas between the sites justifies the need for a new facility (including without limitation a microcell or repeater) in this area of Wayland or Weston." By this statement, AT&T acknowledges this region that straddles the Wayland-Weston border where the computer model may not provide sufficient certainty about the network design. A drive test of the Weston site and the proposed Wayland sites would indeed have illuminated this question, which would have been more constructive than simply deferring the answer to the question until a tall 120-foot tower were installed at the proposed site.

4

**Broadcast Signal Lab**                              **137 Boston Post Road, Eastern Towers, AT&T Wireless**

The question of this close call is key to the determination of the height of the proposed facility. The AT&T computer estimates show that as the antenna height is lowered, the coverage to the east, diminishes steadily. As observed by AT&T and other participants in the process, even at 120 feet, the computer predicts an incomplete connection with the Weston facility's coverage.

Another reason that a drive test would have been advisable in this situation is the fact that there are various signal levels that constitute wireless coverage. A drive test can show these different levels with the highest degree of accuracy. The computer-estimated coverage is based on AT&T's estimations using a –95 dBm signal strength threshold and propagation models, the basis of each which it declines to reveal. The question, then, is whether the material presented is an indication of a reasonable threshold of coverage. The difficulty lies in the wireless companies' use of a sliding scale depending on what they are trying to show. For instance, AT&T certified compliance with FCC license criteria of serving an area covering a certain percentage of the population by employing a –104 dBm signal strength. It defined this as "adequate coverage" to the FCC. An AT&T filing called a Required Notification is attached. It contains a description of the propagation modeling algorithm and a justification of the –104 dBm signal level threshold used to inform the FCC of its claim of adequate coverage.

Then during its rapid buildout of the past two years or so, called the Liberty Project, AT&T in this region has sought to get coverage along the roadways using the –95 dBm projected signal level as a threshold. AT&T acknowledges that in the future it may seek higher signal levels, just as it is in other parts of the State right now. Here lies the moving target that vexes responsible planning and zoning processes: a wireless company selects what it defines as coverage, framing the conversation to its liking by selecting the threshold signal level that best fits its argument.

If the ZBA is considering the issuance of a Variance on the basis of federal Telecommunications Act of 1996 (TCA), it would need to make a determination that a significant gap exists which the proposed facility would serve, and for which no alternatives would be fruitful (seek advice of counsel on this observation, which is only based on my experience with dozens of other wireless facility processes- a document prepared by Kopelman and Paige for the Town of Kingston is also enclosed as an example of interpretations of the TCA in this regard).

To make the significant gap determination, first the gap must be identified. AT&T shows white space on its plots as the purported gap at –95 dBm. No information about –104 dBm is shown. As one resident commenter in the hearing suggested, the AT&T service in the vicinity of the proposed facility is "lousy." (October 21, 2003, p69) This is only one anecdotal comment that does not stand as proof of either lousy or reasonable service, but is does suggest that there is some usable signal arriving in the area. A drive test would have been a more precise indicator of the areas within which the various signal levels would have

5

**Broadcast Signal Lab**                    **137 Boston Post Road, Eastern Towers, AT&T Wireless**

been observed along Route 20. Without the drive test, we must extrapolate where the signal levels at lower and higher thresholds would appear.

To the west of the site, the hill dropping into the Town center appears to act as a physical obstruction to the coverage from the proposed facility. As the antenna height is changed, the coverage in this direction, including Route 20, does not appreciably change. Since this is a relatively short distance, perhaps a half mile the signal level may be substantially stronger than −95 dBm at the terrain edge and it may diminish precipitously below −95 and −104 dBm as the user drops over the hill. So there is not much to be gained in this direction from analysis of the different signal level thresholds.

In the opposite direction, easterly along Route 20, the AT&T computer-estimated −95 dBm coverage diminishes approximately ¼ mile as the antenna height is reduced from 120 to 75 feet. This gradual transition in the position of the −95 dBm boundary with changing antenna height suggests that there may be a more gradual reduction in signal level in which the terrain does not play the major role. The terrain is fairly level in the vicinity of the −95 dBm edges easterly on Route 20, suggesting that the signal level may taper off beyond −95 to −104 and beyond as one travels east. This is the reason that a wireless engineer may be less concerned about making a rock-solid connection in the Weston-Walyand area—an excursion of signal level to the lower −104 dBm threshold can be satisfactory.

In the reverse, what are the characteristics of the signal already coming in from other sites to the target area? Perhaps most relevant is the signal from the Sudbury Landfill site. It is only about ¼-½ mile farther west of the location we drive tested in the Nextel case. That location was at the Town "Old Landfill" site. Discussion has occurred in this hearing about our drive test in the Nextel case and some clarifications are in order. First, the Nextel frequencies are less affected by vegetation than the PCS frequencies AT&T and Sprint use, so there might be more PCS signal loss at a distance on Route 20 than our drive test showed for Nextel. Nevertheless, we did see that there was a propagation path from a facility by the Sudbury-Wayland line to the easterly portion of Route 20 in Wayland. It is conceivable that a substantial amount of −104 dBm AT&T service exists on Route 20 in the eastern Walyland area. There may be segments of −95 dBm service as well that were not predicted by the AT&T model. Only a drive test would capture the character of the signal performance from west to east. Indeed, as observed by Mr Wysocki, the pocket of lower signal level I identified in the terrain "trough" along Route 20 near the Temple would still be such a pocket for the emissions from any facilities near the Sudbury-Wayland line. That does not mean that a 120-foot tower has to be installed in the pocket to resolve its signal level depression. If the pocket causes enough call interruption to be considered significant, then lower less intensive facilities might be all that are required to fill the pocket, depending on how well the rest of this portion of Route 20 is being served. Recall that it is Route 20 that is AT&T's stated primary objective, with the benefits of additional coverage

6

in the neighborhoods adjacent to Route 20 to the degree that they result from obtaining more Route 20 coverage.

Based on the foregoing, the signal levels coming from the Sudbury facility to the eastern portion of Route 20 are likely to be useable in some locations along eastern Route 20. However, there is sufficient distance and obstruction to these signals that it is reasonable to conclude that there is a gap in reasonably uninterrupted communication for AT&T subscribers along at least a short portion of eastern Wayland's Route 20, particularly in the terrain pocket, and also near the Weston-Wayland line (both sides).

Summarizing, at –95 dBm there is a gap in AT&T service along Route 20 in eastern Wayland, although it may not be as extensive as that shown by AT&T on its plots. At –104 dBm the gap in eastern Wayland may be substantially less, but it is likely that there remains at least a small gap in the terrain pocket described above. There are no field measurements to better quantify the gap and the differences in gap depending on the threshold chosen.

At an in-building service level of, say, -85 dBm, a measure of service AT&T is likely to seek for local in-building service in the future, then the gap is substantial in size (leaving the discussion of the significance of any gap for a separate discussion below). AT&T is not making this claim today; however, it would be imprudent to overlook the possibility that AT&T will be back soon for another facility, particularly when the Town could be saddled with a tall tower whose height could be rendered unnecessary with a two-facility design in the future.

The significance of a gap is subjective. AT&T has submitted traffic statistics that the Board may consider in evaluating the significance of a gap. Recall that in Lincoln, some 40,000 cars per day on Route 2 were considered of enough significance for the court to apply the TCA.

The AT&T computer estimates of coverage from the height of 75 feet at the proposed facility site(s) , compared to the 110-120-foot heights, suggest that there would be only a minor reduction in service, based on the –95 dBm threshold, to the east toward the estimated coverage of the Weston facility. Since there is no coverage overlap shown to the east even at the 120-foot height and since there is no drive test data to verify actual coverage at 120 or 75 feet, and since AT&T is willing to wait until facilities are constructed to take measurements to see if a third facility is necessary near the Weston-Wayland line (on either side will do), then a reduction in the height of the proposed tower is not out of the question. Even at a 70-foot height (ten feet above the reported tree canopy) AT&T could obtain provide a higher grade of service to a substantial portion of Route 20 in eastern Wayland than it presently has.

**Broadcast Signal Lab**                    **137 Boston Post Road, Eastern Towers, AT&T Wireless**

The highest-potential alternatives to the proposed site(s) are the electrical transmission towers. Sprint is actively studying them for their viability. AT&T acknowledges that some of them would be suitable substitutes for the proposed facility, from the perspective of coverage, but casts its doubt on the viability of the sites from the perspectives of access, development and availability. More work could be done to explore the potential roadblocks that AT&T visualizes. In fact, Sprint is doing just that.

Other sites that AT&T indicated it has tried and failed to obtain owner interest in leasing include other parcels, particularly some with non-residential uses mostly east of the proposed location(s). If these landowners were confronted with 120-foot tower proposals and declined, they might be more receptive to shorter, less intrusive installations, either on existing structures, extensions of existing structures, or separate poles or towers.

If the ZBA cannot or will not grant a variance under Massachusetts law and local bylaw, then the question arises, is the denial of the proposed facility at 137 Boston Post Road an effective prohibition of service?

To address this question, the ZBA may wish to consider the following:

Is there a gap in AT&T service?

Is the gap of such size or impact that it is significant?

If the ZBA denies the facility as proposed, is there a viable alternative?

Answering the first question, is there a gap in service, I have indicated that I feel there is to some degree a gap in service along the subject section of Route 20 in eastern Wayland and western Weston. By the least measure the gaps may be small and intermittent, but we lack drive test data to demonstrate its breadth. By the proposed AT&T measure today (-95 dBm using only computer estimations) the gap is as shown on the plots. By a likely future AT&T measure the gap is even wider than it has shown.

As to the significance of the gap, a judgment of the traffic data should be made. By any measure, there is not likely to be reasonably uninterrupted communication along at least a small stretch of Route 20.

Regarding a non-approval of the facility, would the door be closed on filling gaps deemed to be significant? In the least measure, it is possible that a relatively small low profile facility will fill the terrain pocket and more of Route 20 to a degree sufficient to provide service. There is not enough data about –104 dBm coverage to determine this. If it is necessary to have greater coverage along Route 20 than a low profile facility near the terrain pocket can provide, then other options include a distributed antenna system along

8

Route 20 (perhaps a utility-pole-mounted antenna every 1/4 mile or so), a much shorter tower at the proposed site(s), or the use of the electrical transmission towers. If a shorter tower than proposed is employed, it may be viable at other sites as well, if it is sufficiently less objectionable to landowners who declined the offer of a 120-foot tower.

If Sprint finds an electrical transmission tower location that is viable, it is likely AT&T can do the same. If Sprint finds it must turn back to its application at 135 Boston Post Road, which AT&T is signed on as co-applicant, a ZBA non-approval of 137 Boston Post Road now does not preclude a later finding of no alternatives and approval of 135 Boston Post Road. One difficulty with this approach is that if 137 Boston Post Road is a less objectionable alternative to 135, 137 as a disapproved site would not be a viable option anymore.

## Other Matters

In addition to analysis of the coverage and siting issues of the proposed facilities, the Town seeks comment on other topics.

The noise report was prepared by a company with whose work I am familiar. They employ industry standard methods to conduct their measurements and analysis. The analysis reasonably interprets the Wayland Noise Code and wireless facility noise criterion as well as the Massachusetts DEP air pollution standard for noise. No information was given about the exact location of the monitoring unit on the site, but assuming its location was close to or on the leased tower site it appears there are no localized noise sources to confound the analysis (except the temporary noise from lawn equipment on a Saturday, which was reasonably discounted in the estimation of average and background levels).

The human ear is a powerful discriminator, even in the presence of background noise. The quietest background levels measured, 48 dBA, could have a particular frequency distribution that does not mask a 42 dBA noise source from the facility with a different frequency distribution. The DEP criteria address "pure tone" conditions where the energy in any third-octave band exceeds that adjacent bands by 3 dB or more. The noise report does not address this issue. In a very general description, the noise of a wireless site consists of electric motors and fans running cooling equipment, not unlike the noises of window or central air conditioners. They are characterized by a general broad band rushing sound of air turbulence plus hums from the electric motors and higher pitched sounds from the rotational rates of the moving parts. In aging systems there may be vibration noises, such as rattling or buzzing, and squeaks or whistles that exceed the noise measured at the factory.

The computations for position of the noise sources and attenuation over distance to the property lines are not presented in the report, so they cannot be peer-reviewed. However, the conclusions of the report are

9

**Broadcast Signal Lab**                    **137 Boston Post Road, Eastern Towers, AT&T Wireless**

consistent with noise characteristics I have observed at other similar wireless facilities in similar configurations.

In general, then, the noise analysis reasonably concludes with an expectation of compliance with the applicable regulations. However, if the facility is approved, additional conditions could be imposed to ensure that coherent sounds or "pure tone" conditions that arise during the life of the facility be eliminated by suitable maintenance or repair in a timely manner upon notification by the town.

The radio frequency emissions of the facility as proposed are compliant with FCC regulations regarding human exposure to radio frequency energy. 47 CFR 1.1307 Table 1 indicates that the proposed facilities are below the threshold of *routine evaluation*, which is indicative of an inherently compliant configuration. There are no apparent exceptional conditions in this case (such as a ten-story building next to the proposed tower) that would negate the use of Table 1 to make the determination.

David Maxson
June 15, 2004

**Broadcast Signal Lab**                    **137 Boston Post Road, Eastern Towers, AT&T Wireless**

**AT&T Required Notification to the FCC**

AT&T Wireless PCS, LLC
FCC Form 601 Required Notification
Section 24.203 Showing
KNLF216
Boston MTA
MTA008

### Demonstration of Construction Requirements

Within 5 years of being licensed, Section 24.203 of the Commission's rules requires 30 MHz broadband PCS licensees to serve one-third of the 1990 population in the license area with a signal level sufficient to provide adequate service. On June 23, 1995, AT&T Wireless PCS, LLC[1] ("AWP") was licensed to operate a broadband PCS system on spectrum block A in the Boston MTA (MTA0008). Call Sign KNLF216 was assigned.

The 1990 population of the Boston MTA is 9,452,712. AWP's Boston system provides a signal level sufficient to provide adequate service to a 1990 population of 5,177,666. Therefore, AWP provides a signal level sufficient to provide adequate service to 55% of the population of the MTA.

Attached is (1) a map that graphically depicts the area in the MTA which receives a signal level of -104 dBm or better and (2) an exhibit which justifies the use of -104 dBm as the signal level to define adequate service and which explains how AWP arrived at the population receiving adequate service.[2]

The foregoing materials demonstrate that AWP has met its Section 24.203 buildout requirement. By the signature of the officer executing the instant FCC Form 601, AWP hereby certifies that the information contained in this notification is accurate.

---

[1] The initial authorization was issued in the name of AT&T Wireless PCS, Inc. As a result of a reorganization of its PCS operations, on September 7, 1999, AT&T Wireless PCS, Inc. was converted to a limited liability company whose name is AT&T Wireless PCS, LLC. Notification to the Commission of the pro forma assignment of license was filed with the FCC on October 4, 1999. See File No. 0000030525.
[2] Specific information listing each of the Census Block Groups used to determine the population receiving adequate service will be supplied on request.

1

## Engineering Justification

Section 24.203(a) of the Commission's Rules states that licensees of 30 MHz blocks must provide adequate service to at least one-third of the population in their licensed area within five years of being licensed. AT&T Wireless PCS, LLC ("AWP") defines adequate coverage as –104 dBm.

The –104 dBm level is the lowest value that the mobile phones used by AT&T Wireless will consistently carry a discernable call. This value is derived in the following list:

$$
\begin{array}{ll}
\text{Antenna Noise} & -130\ \text{dBm} \\
\text{Noise figure of mobile} & 9\ \text{dB} \\
\text{Carrier/noise (3\% BER)} & \underline{+\ 17\ \text{dB}} \\
& -104\ \text{dBm}
\end{array}
$$

Calculations of the distance to this contour are obtained from complex propagation models used in designing and analyzing the network. The models are based on the Cos 231-Hata model defined as follows:

$$L = 46.3 + 33.9\log(f) - 13.82\log(H_b) - a(H_m) + [44.9 - 6.55\log(H_b)]\log(d) + C$$

where

$$a(H_m) = (1.1\log(f) - 0.7)H_m - (1.56\log(f) - 0.8)$$

### Calculation of population covered

Three data sets were required to determine the approximate population covered in the MTA.

An RF propagation prediction generated at the defined signal strength for adequate service, i.e., -104 dBm

A map of Census Block Groups ("Block Groups") provided by Geographical Data Technology, Inc.

1990 U.S. Census population counts for each Block Group.

Each Block Group was associated with the MTA within which it was located. The Block Groups were overlaid with the RF propagation prediction showing coverage of -104 dBm or greater[1] throughout the MTA. A calculation was conducted showing the percentage of each Block Group that received coverage of -104 dBm or greater. The percentage of the Block Group covered by a signal level of -104 dBm or greater was multiplied by the 1990 population for the Block Group in question. The population of all Block Groups in the MTA receiving coverage of -104 dBm or

---

[1] Block Groups that are covered by spurious predicted RF were removed and, hence, not used.

1

greater was added together to arrive at the total population of the MTA receiving adequate service.

Broadcast Signal Lab                    137 Boston Post Road, Eastern Towers, AT&T Wireless

Kopelman and Paige Opinion to the Town of Kingston

On TCA-Based Decisions

12



**Legend**
- -104 dBm Service Area
- MTA Boundary
- BTA Boundary

Scale: 1:3,633,548

30    0    30    60    90
**Miles**

Presque Isle

**Boston**

Waterville-
Augusta

Lewiston-
Auburn

Bangor

Lebanon-
Claremont

Manchester-
Nashua-
Concord

Portland-
Brunswick

Keene

Boston

Springfield-
Holyoke

Worcester-
Fitchburg-
Leominster

Boston

Pittsfield

Providence-
Pawtucket

Hyannis

MTA Population 1990 - 9,452,712
MTA Population Covered - 5,177,666

**Boston/Providence - MTA #8**
**5 Year Build Showing**

LEONARD KOPELMAN
DONALD G. PAIGE
ELIZABETH A. LANE
JOYCE FRANK
JOHN W. GIORGIO
BARBARA J. SAINT ANDRE
JOEL B. BARD
EVERETT J. MARDER
JOSEPH L. TEHAN, JR.
ANNE-MARIE M. HYLAND
THERESA M. DOWDY
DEBORAH A. ELIASON
RICHARD BOWEN
DAVID J. DONESKI
JUDITH C. CUTLER
ILANA M. QUIRK
KATHLEEN E. CONNOLLY
DAVID C. JENKINS
MARK R. REICH
———
EDWARD M. REILLY
DIRECTOR WESTERN OFFICE
———
WILLIAM HEWIG III
JEANNE S. McKNIGHT
KATHLEEN M. O'DONNELL

**KOPELMAN AND PAIGE, P. C.**

ATTORNEYS AT LAW

31 ST. JAMES AVENUE

BOSTON, MASSACHUSETTS 02116-4102

(617) 556-0007

FAX (617) 654-1735

PITTSFIELD OFFICE
(413) 443-6100
———
NORTHAMPTON OFFICE
(413) 585-8632
———
WORCESTER OFFICE
(508) 752-0203

SANDRA M. CHARTON
PATRICIA A. CANTOR
THOMAS P. LANE, JR.
BRIAN W. RILEY
MARY L. GIORGIO
DARREN R. KLEIN
THOMAS W. McENANEY
JONATHAN M. SILVERSTEIN
KATHARINE GOREE DOYLE
GEORGE X. PUCCI
LAUREN F. GOLDBERG
JASON R. TALERMAN
MICHELE E. RANDAZZO
GREGG J. CORBO
RICHARD T. HOLLAND
LISA C. ADAMS
ELIZABETH R. CORBO
DANIEL C. HILL
MARCELINO LA BELLA
VICKI S. MARSH
JOHN J. GOLDROSEN
SHIRIN EVERETT
TANYA O. TREVISAN
BRIAN E. GLENNON, II
JONATHAN D. EICHMAN
MICHAEL C. GLEBA
TODD A. FRAMPTON
CAROLYN M. MURRAY
JACKIE A. COWIN

**January 3, 2003**

Zoning Board of Appeals
Kingston Town House
23 Green Street
Kingston, MA 02364

Re:    <u>Proposed Wireless Communications Facility, off Ring Road</u>

Dear Members of the Zoning Board of Appeals:

You have requested an opinion regarding an appeal from the denial of a building permit application, an application for a variance, and an application for a permit for a specific use, all pertaining to a proposed 120-foot high wireless communications facility to be located on property off of Ring Road shown on Map #53, Lot#4 ("the Property"). You have asked a number of questions, including whether the Board has the authority to issue a use variance, whether the Town's Zoning Bylaws may be interpreted to allow the proposed use at the Property, and how the federal Telecommunications Act impacts the Board's decision.

In my opinion, under the Town's Zoning Bylaws, §6.11.2.2, the proposed facility would not be allowed at the Property because the Property is not located in the Industrial or Commercial/Industrial Park districts. It is my further opinion that under the state Zoning Act, G.L. c. 40A, § 10 and the Bylaws, §7.5.2.1.c.1, the Board is not empowered to issue a use variance.

However, it also is my opinion that under the legal framework created by the federal Telecommunications Act of 1996, 47 U.S.C. §332(c)(7) ("TCA"), the Board has a separate source of authority to grant relief that is the equivalent of a use variance. In other words, it is my opinion that while state law and the Bylaws would not authorize the Board to grant a use variance, under federal law the Board could do so. In my further opinion, if the applicant proves that the denial of the relief would have the effect of prohibiting personal wireless services under the TCA and the Board denies the relief, there is a significant risk that the decision would be subject to challenge in federal court for violation of the TCA.

KOPELMAN AND PAIGE, P.C.

Zoning Board of Appeals
January 3, 2003
Page 2

You have informed me of the following facts. AT&T Wireless PCS, LLC, along with Omnipoint Holdings, Inc., and National Tower, LLC (collectively, "the Applicants") have applied to install, maintain and operate a Wireless Communication Tower and related facilities on the Property, which is owned by Mr. Domingo Fernandes and which is located in the R-40, residential zoning district. The tower is described as a 120-foot high monopole with a "cylindrical appearance that can be made to appear as a flagpole." A "supporting equipment cabinet" will be constructed within a fenced area near the base of the pole.

On August 29, 2002, the Town's Building Inspector/Zoning Enforcement Officer denied a building permit application because the "location is not in a non-residential area as required in Bylaw Section 6.11.2. 7.1 Flagpole does not blend into natural surroundings as required by section 6.11.2.7.1." Thereafter, the Applicants appealed to the Board for review of the Building Inspector's decision, to allow a variance from the Bylaw §6.11.2.7.1 (and §7.5.2.1, if necessary), and/or to issue a permit for a specific use under §6.11.2.1 and §7.7.2. At the hearing, the Board upheld the Building Inspector's decision and continued the hearing regarding the interpretation of the Bylaws on the application for a variance and other permits.

In summary, the Applicants argue that the Bylaws, §6.11.2.3, gives the Board discretion to permit the use in other than the Industrial or Commercial/Industrial Park Zoning Districts because the Bylaw states that the use may be located in those districts "wherever possible," thereby implying that, in some circumstances, the use may be allowed outside of those districts. Alternatively, they argue that the Board should issue a variance.

### The Town's Zoning Bylaws

Section 6.11 of the Zoning Bylaws regulates Communications Towers and Wireless Communications Facilities. Section 6.11.2.1 provides: "No wireless communications facility shall be erected or installed except in compliance with this Bylaw. In all cases, a Special Permit is required from the Board of Appeals." Section 6.11.2.2 states: "Wireless communications facilities may be allowed by Special permit on all land located in the Industrial Districts (I) and in the Commercial/Industrial Park Districts. Wireless communications antennas . . . may be mounted or attached to existing structures, including but not limited to water towers and church steeples, in any district. All wireless communications facilities must be designed and screened as required by Section 6.11.4.4." Before a building permit may be issued, the Bylaw, §7.1.1 requires that a "Zoning Permit," "indicating compliance with this Bylaw" be obtained from the Zoning Enforcement Officer.

KOPELMAN AND PAIGE, P.C.

Zoning Board of Appeals
January 3, 2003
Page 3

In my opinion, under §6.11.2.2 a new free-standing wireless communications facility, a monopole under §6.11.2.4, such as the Applicants propose, is restricted to land located in the Industrial (I) and the Commercial/ Industrial Park Districts. It is therefore my opinion that the Bylaw does not permit such a facility to be located in the R-40 residential district. While §6.11.2.3 states: "Whenever possible, wireless communications facilities shall be located in the two (2) non-residential zoning districts described in Section 6.11.2.2," it is my opinion that that provision states a preference applicable to all wireless communications facilities, including antennas attached to existing structures, but does not confer discretion on the Board to allow a free-standing new monopole outside of the Industrial (I) and the Commercial/ Industrial Park Districts.

In my further opinion, §6.11.2.7.1, which allows a special permit where the Board makes a finding that "a proposed antennae or other wireless communication equipment would blend with the natural surroundings and show no evidence of being a communication facility," does not apply in these circumstances because the exception applies only in a "non-residential area." The area in question, the Property, is located in a residential zoning district. The Applicants argue that the use of the word "area" in this section is broader than the term "zoning district" used elsewhere, and that that means the Board may allow the special permit in the non-residential "area" despite the fact that the Property is not located in a residential zoning "district."

It is my opinion that the use of the word "area" in §6.11.2.7.1 does not change the requirement that a new free-standing monopole may only be located in the Industrial (I) and the Commercial/Industrial Park Districts. I therefore do not agree with the Applicants' interpretation of the Bylaw. Regarding the Applicant's claim that the proposed facility complies with §6.11.2.7.1 because it blends into the natural surroundings and shows no evidence of being a communication facility, it is my opinion that whether the facility so complies is a matter within the Board's discretion.

Under the second sentence of §6.11.2.2, if the proposed facility is not a new monopole, but is to be mounted or attached to an existing structure, such a facility could be located in a residential district, assuming the other provisions of the Bylaw are satisfied.

The Bylaw, in §7.5.2.1, provides: "No variance may authorize a use or activity not otherwise permitted in the District in which the land or structure is located." See also, G.L. c. 40A, §10, which provides that unless a use variance is specifically allowed in a zoning bylaw, it is prohibited. It is therefore my further opinion that, except as explained below, the Board may not issue a use variance. Because the proposed use would not comply with the Town's zoning requirements, the Zoning Enforcement Officer also could not issue a Zoning Permit for the use.

KOPELMAN AND PAIGE, P.C.

Zoning Board of Appeals
January 3, 2003
Page 4

If the only laws applicable to the Applicants' proposed use were state law and the Town's Zoning Bylaws, the Board would be acting well within its authority if it were to deny the requested relief. However, since federal law is involved, the legal context changes considerably.

<u>The Telecommunications Act</u>

The TCA, in §332(c)(7)(B)(i), provides: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof − ... (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." Section 332(c)(7)(B)(ii) defines "personal wireless service facilities" as "facilities for the provision of personal wireless services."

In a growing number of cases, the federal district courts have found that permit and variance denials violate the TCA, even if such denials would be valid under state law. For example, in <u>Omnipoint Communications</u> v. <u>Town of Lincoln</u>, 107 F. Supp. 2d 108 (D. Mass. 2000) ("<u>Omnipoint</u> v. <u>Lincoln</u>"), the court found that denial of a variance for a location outside of the town's wireless overlay district violated the federal law and ordered the variance to issue despite a bylaw provision prohibiting use variances. Recently, in <u>Nextel Communications of the Mid-Atlantic, Inc.</u> v. <u>Town of Wayland</u>, United States District Court, No. 02-CV-10260-REK, November 22, 2002, the federal court reached the same result. In that case, the federal court stated: "Although the Board's statement [regarding its lack of authority to issue a use variance] may be a correct statement in Massachusetts regarding variances, it is not controlling in the special case of wireless communications facilities ... Under the Telecommunications Act, the Board cannot deny the variance if in so doing it would have the effect of prohibiting wireless services."

It is therefore my opinion that under the federal mandate of the TCA, the federal courts have ruled that the principles of the TCA override the state law on variances and that the Board has the authority under the TCA issue the permits, including a variance.



In order to grant such relief, however, it is my opinion that the Board must find that without the proposed facility the Applicants will be prohibited from providing personal wireless services. As explained below, such a finding involves several other findings, namely: (1) that there is a significant gap in coverage without the facility; and (2) that there is no other feasible alternative site for the facility. <u>Omnipoint</u> v. <u>Lincoln</u>; <u>Telecorp Realty LLC</u> v. <u>Edgartown</u>, 81 F. Supp. 2d 257 (D.Mass. 2000); and <u>Nextel Communications of the Mid-Atlantic, Inc.</u> v. <u>Manchester-by-the-Sea</u>, 115 F.Supp. 2d 65 (D.Mass. 2000).

**KOPELMAN AND PAIGE, P.C.**

Zoning Board of Appeals
January 3, 2003
Page 5


As interpreted by the federal courts, a prohibition or effective prohibition is proven if the plaintiff establishes that there is a significant gap in coverage in a geographical area and that the gap only can be filled by siting the facility at the particular location chosen by the applicant. The term "significant gap in coverage" does not have a precise definition, but is determined by the courts on a case-by-case basis. Second Generation Properties v. Town of Pelham (New Hampshire), United States Court of Appeals for the First Circuit, No. 02-1688, December 17, 2002. Among the factors that the courts have considered in deciding whether a significant gap in coverage exists are: the length of the gap, whether it is in a populated area (for example, not a "small residential cul-de-sac"), and whether it is along a "heavily traveled commuter thoroughfare." Omnipoint v. Lincoln. In the recent Second Generation Properties decision, the First Circuit held that it is permissible for a board in evaluating a claim that a permit denial would prohibit personal wireless services under the TCA to consider: "(1) roaming service, (2) the coverage provided from towers in other towns, and (3) service by carriers not licensed in the jurisdiction at issue."

Regarding whether there are other feasible alternative sites for the proposed facility, the courts have generally required the applicant to prove that other specific sites have been seriously investigated and the reasons the site were rejected as being unavailable or not providing the needed coverage. The courts do not require a municipality to show that additional sites exist or are available. Second Generation Properties.

The courts have upheld permit denials where the applicant has not established a coverage gap or where the applicant has not thoroughly investigated other possible locations. See, Town of Amherst, NH v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9 (1st Cir. 1999); Second Generation Properties.

Recommendations

In evaluating the Applicants' requests for zoning relief in the context of the TCA, I recommend the following.

The Board should make its usual findings under the Bylaws independently of the TCA issues. If the application of the Bylaws would result in denial of the requested relief, then the Board should take the next step of analyzing the application under the TCA. In so doing, the Board should consider whether the relief might be granted under the TCA, even if the relief could be denied under the Bylaws and state law. In addressing the TCA issues, the Board should apply the factors identified above in the case law to decide whether the Applicants have proven that there is a significant gap in coverage and whether there is an alternative feasible location for the facility. In making these determinations, it is not necessary for the Board to make formal

KOPELMAN AND PAIGE, P.C.

Zoning Board of Appeals
January 3, 2003
Page 6

findings of fact, but it is essential for the Board to explain its reasons based upon the evidence it hears at the public hearing.

Finally, I note that the TCA issues, particularly those involving technical data pertaining to whether there is a significant gap in coverage, are often very complex and may require further technical analysis. If that is the case here, the Board may want to request the Applicants to pay for an independent consultant to assess that evidence. While the Bylaws do not expressly provide for such a consultant, it is my opinion that the Board has the authority to so request. If the Applicants agree, Board should also request that they agree to further extend the time in which the Board may take final action on the variance application.

If you have any further questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

Patricia A. Cantor

PAC/dlf
cc:    Board of Selectmen
177886/KING/OPIN

## SECTION III - TRAFFIC VOLUMES BY CITY/TOWN



| STA | CITY/TOWN | ROUTE/STREET | LOCATION | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S002 | WAREHAM | RTE. 28 | BTWN. MAPLE SPRINGS RD. & RTE.6 | | | | | | | | | | |
| S903 | WAREHAM | RTE. 28 | EAST OF RTE.I-195 | 15,000 | | | | | | | | | |
| S901 | WAREHAM | RTE. 28 | WEST OF DEPOT ST. | | | | | | | | | | |
| S001 | WAREHAM | RTE. 28 | WEST OF TREMONT ST. | | | | | | | 28,190 | | | |
| 7173 | WAREHAM | RTE. 28 & 6 | EAST OF DEPOT ST. | | | | | | | | | 7,900 | |
| S909 | WAREHAM | RTE. 28 & 6 | WEST OF DEPOT ST. | 7,200 | | | | 20,000 | | | | | |
| S010 | WAREHAM | RTE. 28 & 6 | WEST OF GLENN CHARLIE RD. | | | | | | | 23,300 | | | |
| S01 | WAREHAM | RTE. 58 | AT CARVER T.L. | 5,900 | | | | | | | | | |
| 7482 | WAREHAM | RTE.I-195 | WEST OF GLENN CHARLIE RD | | 8,400 | | | | | | | | |
| 7106 | WAREHAM | RTE.I-495 | WEST OF RTE.25 | | | | | | | 18,800 | 24,200 | | |
| SD12 | WAREHAM | SOUTH BOULEVARD (ONE-WAY) | SOUTH OF RTE.58 | | 38,000 | | | 29,600 | | | | | |
| SD03 | WAREHAM | TIHONET RD. | NORTH OF PROSPECT AVE. | | | | | 1,100 | | | | | |
| SD03 | WAREHAM | TIHONET RD. | OVER RTE.25 | | | | | | | | | | 1,200 |
| SD01 | WAREHAM | APPLE RD. | OVER RTE.25 | 1,000 | | | | | | | | | |
| S001 | WARREN | COY HILL RD. | AT BRIMFIELD T.L. | | 1,200 | | | | | | | | |
| SD04 | WARREN | RTE. 19 | NORTH OF RTE.67 | | | | | | | 640 | | | |
| S003 | WARREN | RTE. 67 | AT BRIMFIELD T.L. | | | | | 1,000 | | | | | |
| S002 | WARREN | RTE. 67 | AT PALMER T.L. | | | | | | | 4,200 | | | |
| SD01 | WARREN | SOUTHBRIDGE RD. | SOUTH OF WASHINGTON ST. | | | | | 2,400 | | 2,200 | | | |
| SD01 | WARREN | WARE RD. | NORTH OF RTE.67 | | | | | | | | | | |
| SD03 | WARWICK | HOCKANUM RD. | NORTH OF RTE.78 | | | | | | | 2,200 | | | |
| S903 | WARWICK | RTE. 78 | WEST OF RTE.78 | | 270 | | | | | | | | |
| SD01 | WARWICK | RTE. 78 | AT NEW HAMPSHIRE S.L. | | | | | | | | | | 1,100 |
| 8001 | WASHINGTON | PITTSFIELD RD. | BTWN. BEACH RD. AND DALTON T.L. | | | | | | | 15,300 | | | |
| 8038 | WATERTOWN | ARSENAL ST. | NORTH OF ARSENAL ST. | 37,400 | | | | 10,900 | | | | | |
| SD01 | WATERTOWN | ARLINGTON ST. | OVER CHARLES RIVER | 3,700 | | | | | | | | | |
| 2016 | WATERTOWN | COOLIDGE AVE. | EAST OF GROVE ST. | 12,300 | | | | | | | | | |
| S001 | WATERTOWN | GRENOUGH BLVD. | EAST OF ARSENAL ST. | | | | | | | | | | |
| S005 | WATERTOWN | SCHOOL ST. | NORTH OF MOUNT AUBURN ST. | | | | | 9,400 | | | | | |
| S002 | WAYLAND | PELHAM ISLAND RD. | WEST OF RTE.27 | | | | | | | 8,000 | | | |
| SD04 | WAYLAND | RTE. 20 | WEST OF RTE.27 | | | | | | | 6,400 | | | |
| 4133 | WAYLAND | RTE. 20 | EAST OF RTE.27 | | | | | | | 23,100 | | | |
| SD02 | WAYLAND | RTE. 20 | WEST OF RTE.27 | | | | | | | 18,600 | | | |
| S003 | WAYLAND | RTE. 27 | NORTH OF PELHAM ISLAND RD. | | | | | | | 22,400 | | | |
| S008 | WAYLAND | RTE. 27 | NORTH OF RTE.128 | | | | | | | 11,800 | | | |
| SD02 | WAYLAND | RTE. 128 | SOUTH OF RTE.20 | | | | | | | 25,000 | | | |
| SD03 | WAYLAND | RTE. 27 | NORTH OF RTE.20 | | | | | | | 16,400 | | | |
| SD03 | WAYLAND | RTE. 126 | NORTH OF RTE.27 | | | | | | | 8,000 | | | |
| SD02 | WEBSTER | BIRCH ISLAND RD. | EAST OF RTE.193 | | | | | | | 8,400 | | | |
| S902 | WEBSTER | HILL ST. | SOUTH OF RTE.193 | | | | | | | 1,200 | | | |
| S901 | WEBSTER | LAKE PARKWAY | WEST OF RTE.183 | | | | | | | | 3,300 | | |
| S007 | WEBSTER | LAKE ST. | WEST OF BEACON ST. | | | | | | 8,400 | | | | |
| S906 | WEBSTER | PERRYVILLE RD. | NORTH OF BROOKSIDE AVE. | | | | | | 7,300 | | | | |
| SD04 | WEBSTER | PLEASANT ST. | NORTH OF RTE.12 | | | 3,600 | | | | | | | |
| S005 | WEBSTER | RTE. 12 | NORTH OF PLEASANT ST. | | | | | | | | 830 | | |
| S002 | WEBSTER | RTE. 16 | WEST OF LINCOLN ST. | | | 17,000 | | | 21,400 | | 19,500 | | |
| S004 | WEBSTER | RTE. 16 | EAST OF RAWSON RD. | | 12,000 | 12,000 | | | 12,300 | | 17,000 | | |
| 3208 | WEBSTER | RTE. 16 | EAST OF RTE.I-395 | 4,100 | | | | | | 12,500 | 6,000 | | |
| S001 | WEBSTER | RTE. 193 | AT CONNECTICUT S.L. | | | | 12,300 | | | | | | |
| S001 | WEBSTER | RTE. 193 | NORTH OF BIRCH ISLAND RD. | | | | | | | | | | |
| S001 | WEBSTER | RTE. 193 | NORTH OF BIRCH ISLAND RD./LAKE ST. | | | | | | 10,200 | 11,800 | | | |
| S015 | WEBSTER | RTE. 193 | NORTH OF LAKE PARKWAY | | | | | | | | | | |
| S003 | WEBSTER | RTE. 193 | SOUTH OF BIRCH ISLAND RD./LAKE ST. | | | | | | | 12,500 | | | |
| S023 | WEBSTER | RTE. 193 | SOUTH OF LAKE PARKWAY | | | | | | 12,100 | 12,900 | | | |
| 3289 | WEBSTER | RTE.I-395 | AT CONNECTICUT S.L. | 15,000 | 14,000 | 19,000 | 18,000 | 16,800 | 17,700 | 19,600 | 19,800 | 18,800 | 22,600 |



# Town of Wayland
# Massachusetts

08/30/04

Search

| HOME | TOWN | COMMUNITY | SCHOOLS | BUSINESS |

History

Location

Statistics

Clubs and
Social Groups

Houses of
Worship

Area Hospitals

Wayland
Focused
Organizations

Advocacy
Groups

Police

Fire

Emergency
Planning

Town
Directory

Boards &
Committees

Volunteers

Meeting
Calendar

Schools

Library

Housing
Authority

Home>Community>History- Location- Statistics



***History*:**
In 1835, East Sudbury became Wayland, a farming community,
presumably in honor of Dr. Francis Wayland, who was President of
Brown University and a friend of East Sudbury's Judge Edward
Mellen. Both Wayland and Mellen became benefactors of the town's
library, the first free public library in the State.

New England farms began to decrease as canals and railroads brought cheaper produce
from the mid-west. Local farmers suffered an additional setback when the Middlesex
Canal Dam raised the river level and hay crops needed for livestock were ruined. Farmers
in Sudbury River towns, including Wayland, brought suit against the Canal and brought
the matter before State legislative hearings in the 1850's, all to no avail.

The Industrial Revolution caused transportation patterns to change. By 1881, a new train
station connecting Wayland Center with Boston and Northampton. Wayland became a
bustling commuter town. Even before commuting was made easy, Wayland's
attractiveness proved appealing as a summer residence for well-to-do Bostonians. They
acquired country estates, built new homes or remodeled older farmhouses, thereby
providing an economic stimulus to the northern end.

In contrast to the scattered farms and summer residences of the northern end, a compact
mill center developed in Cochituate Village. In 1830, the Bent family started the shoe
industry at the corner of Routes 27 and 30, with some of the work parceled out to
neighbors. By the late 1850's, the Bent factory employed several hundred people, many of
them immigrants. This influx necessitated new housing for the area. The center of the
shoe industry shifted from Bentville to the Lokerville area (Route 30, East Plain Street and
School Street intersection).

In the 1880's at the peak of shoe manufacturing activity, there were at least ten shops
employing over 600 workers; the Bent Factory accounted for half of this total. By 1900,
Cochituate had surpassed the rest of the town in population, with two-thirds of the 2000
total.

By 1910, the shoe industry declined in Cochituate and all of the shoe factories closed
down. The unemployed were forced to seek work elsewhere or move. After World War I,
Dudley Pond became a summer recreational area, and during the Depression, many of the
cottages became permanent residences. In the northern end of town, farmers continued to
work the land, but after World War II, the cornfields and market gardens began to
disappear.

Town Code

Zoning Bylaws

Town Maps

Town Meeting

Job Openings

Contact Us

Site Map

Usage Notice

Wayland became more accessible and attractive as a suburb as industries began to locate along the new Route 128 and the state began construction on the Massachusetts Turnpike. In 1955, Raytheon built a large-scale industrial laboratory near the Center, which increased the need for housing. Many farms and large estates broke up and were replaced by housing developments. The population soared to 13,000 by 1968. Since that time, the number of residents has leveled off.

The meadows and marshes along the ten-mile course of the Sudbury River through Wayland have been kept relatively unspoiled and are now the object of private and public efforts to maintain them in their natural state. They are still full of wild life and are beautiful to see. They provide an open, rural setting and an attractive feature of what has become an almost purely residential town.

### *Location:*
Wayland is a semi-rural community located in the MetroWest region of Eastern Massachusetts, in Middlesex County just 18 miles from Boston, 26 miles from Worcester and 203 miles from New York City. Wayland is bordered on the west by Sudbury and Framingham, on the south by Natick, on the north by Concord and Lincoln and on the east by Weston. Wayland is accessible and attractive as a suburb to the City of Boston and to the businesses and industries located along the Route 128 with convenient access to the Massachusetts Turnpike.

The meadows and marshes along the ten-mile course of the Sudbury River through Wayland have been kept relatively unspoiled and are now the object of private and public efforts to maintain them in their natural state. They are still full of wild life and are beautiful to see. They provide an open, rural setting and contribute to the attractive features and uniqueness of this almost purely residential town.

Wayland is the home of two public golf courses, Wayland Country Club and Sandy Burr Country Club both located on Route 27. There is a town beach located on Lake Cochituate that offers swimming and a boat launch to its residents and guests. Wayland is also fortunate to have other recreational areas such as Mill Pond for fishing, pine-forested picnic areas and many conservation areas for hiking and horse riding trails. In addition, Wayland promotes outdoors athletic activities and provides well equipped basketball courts, ten tennis courts, ice-skating areas, a swimming pool, and several playgrounds.

The Wayland Public School system is regularly ranked as one of the top ten school systems in the Commonwealth of Massachusetts. The schools strive to maintain a strong academic curriculum. In addition, the Wayland Public School Children's Center provides full childcare service from 7:00 A.M. to 6:00 P.M. in a healthy and safe environment for children in grades K-5 every school day. Additional childcare programs are available during school vacations and the summer.

The Town of Wayland is located in the MetroWest region, situated at the halfway point between Boston and Worcester. Wayland is just one of nine communities that comprise MetroWest, the others are Ashland, Framingham, Holliston, Hopkinton, Natick, Sherborn, Southborough and Sudbury. MetroWest is a region rich in history and natural beauty, and offers visitors and residents alike, a vast array of opportunities for such activities as shopping, sightseeing, dining and entertainment.

Attractions within MetroWest include Longfellow's WAYSIDE INN in Sudbury, the oldest continuously operating inn in America, and the peaceful Sudbury River, which provided waterpower for the grain and textile mills that once dotted its shores. The Framingham/Natick stretch of Route 9 features literally hundreds of retail establishments of all kinds as well as fine and casual dining, making it a premier shopping destination. . Just bordering the MetroWest region is another premier shopping destination located in Wellesley, which offers a broad array of upscale dining and shopping, with many small shops and boutiques along Routes 135 and 116. Outdoor enthusiasts will appreciate the abundance of parks, forests, lakes and nature preserves in the region. History buffs can travel back in time to our country's earliest days when they visit nearby landmarks commemorating skirmishes that marked the beginning of the American Revolution. And art lovers will enjoy the variety of museums and galleries they'll find here.

Known as the "Crossroads of New England", MetroWest is easily accessible by air, rail and bus. Both Boston's Logon International Airport and the Worcester Regional Airport are just 30 minutes away, and the area is served by major highway interchanges - including Interstate 495 and 95, Route 9 and the Massachusetts Turnpike (Route 90).

*Statistics:*

| |
|---|
| Form of government: Open Town Meeting |
| County: Middlesex |
| Congressional District: 5th for Precincts 1, 3, and 4 |
| Congressional District: 7th for Precinct 2 |
| Land area: 15.28 square miles |
| Population: 13,949 (06/30/2003) |
| Number of households: 5,739 (6/30/2003) |
| School enrollment: 2,955 (10/2003) |
| Number of registered voters: 8,668 (11/18/2003) |
| Current tax rate: $12.52 per $1,000 (FY 2003) |



# Federal Communications Commission

Atlas & Marketing Guide, 123rd Edition, at pages 38–39 (".BTA/MTA Map"), Rand McNally organizes the 50 states and the District of Columbia into 47 MTA's and 487 BTA's. The BTA/MTA Map is available for public inspection at the Office of Engineering and Technology's Technical Information Center, 445 12th Street, SW, Washington, DC 20554.

(a) The MTA service areas are based on the Rand McNally 1992 *Commercial Atlas & Marketing Guide*, 123rd Edition, at pages 38–39, with the following exceptions and additions:

(1) Alaska is separated from the Seattle MTA and is licensed separately.

(2) Guam and the Northern Mariana Islands are licensed as a single MTA-like area.

(3) Puerto Rico and the United States Virgin Islands are licensed as a single MTA-like area.

(4) American Samoa is licensed as a single MTA-like area.

(b) The BTA service areas are based on the Rand McNally 1992 *Commercial Atlas & Marketing Guide*, 123rd Edition, at pages 38-39, with the following additions, licensed separately as BTA-like areas: American Samoa; Guam; Northern Mariana Islands; Mayagüez/Agua-dilla-Ponce, Puerto Rico; San Juan, Puerto Rico; and the United States Virgin Islands. The Mayagüez/Agua-dilla-Ponce BTA-like service area consists of the following municipios: Adjuntas, Aguada, Aguadilla, Añasco, Arroyo, Cabo Rojo, Coamo, Guánica, Guayama, Guayanilla, Hormigueros, Isabela, Jayuya, Juana Díaz, Lajas, Las Marías, Mayagüez, Maricao, Maunabo, Moca, Patillas, Peñuelas, Ponce, Quebradillas, Rincón, Sabana Grande, Salinas, San Germán, Santa Isabel, Villalba, and Yauco. The San Juan BTA-like service area consists of all other municipios in Puerto Rico.

[59 FR 32854, June 24, 1994; 59 FR 68952, Dec. 14, 1998; 65 FR 53536, Sept. 5, 2000]

## § 24.203 Construction requirements.

(a) Licensees of 30 MHz blocks must serve with a signal level sufficient to provide adequate service to at least one-third of the population in their licensed area within five years of being licensed and two-thirds of the population in their licensed area within 10 years of being licensed. Licensees may choose to define population using the 1990 census or the 2000 census. Failure by any licensee to meet these requirements will result in forfeiture or non-renewal of the license and the licensee will be ineligible to regain it.

(b) Licensees of 10 MHz blocks, including 10 MHz C block licenses reconfigured pursuant to Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licensees, WT Docket No. 97-82, *Sixth Report and Order*, FCC 00-313, and 15 MHz blocks resulting from the disaggregation option as provided in the Commission's Rules Regarding Installment payment Financing for Personal Communications Services (PCS) Licensees, Second Report and Order and Further Notice of Proposed Rule Making, WT Docket 97-82, 12 FCC Rcd 16436 (1997), as modified by Order on Reconsideration of the Second Report and Order, WT Docket 97-82, 13 FCC Rcd 8345 (1998), must serve with a signal level sufficient to provide adequate service to at least one-quarter of the population in their licensed area within five years of being licensed, or make a showing of substantial service in their licensed area within five years of being licensed. Population is defined as the 1990 population census. Licensees may elect to use the 2000 population census to determine the five-year construction requirement. Failure by any licensee to meet these requirements will result in forfeiture of the license and the licensee will be ineligible to regain it.

(c) Licensees must file maps and other supporting documents showing compliance with the respective construction requirements within the appropriate five- and ten-year benchmarks of the date of their initial licenses.

[58 FR 59183, Nov. 8, 1993, as amended at 64 FR 26890, May 18, 1999; 65 FR 53536, Sept. 5, 2000]

## § 24.229 Frequencies.

The frequencies available in the Broadband PCS service are listed in

§ 24.229





# AT&T Wireless - Wayland, MA (MA1056)



**AT&T** WIRELESS SERVICES

## Coverage Contour Legend

- Proposed Site
- Coverage (-95dBm)
- Neighboring Sites
- Coverage(-96dBm)

**Coverage from BECO site, Wayland, MA**
**Antenna Mounting Height: 122'**

## Site Legend

- Proposed Site
- Neighboring Sites
- Alternate sites

SANDEEP GOYAL

October 20 2003