

# TOWN OF WAYLAND
MASSACHUSETTS
01778
# BOARD OF APPEALS

TOWN BUILDING
41 Cochituate Road
TELEPHONE: (508) 358-3600
FAX: (508) 358-3606

## DECISION   03-34

APPLICANT/PETITIONER_____    Sprint Spectrum, L.P. dba Sprint PCS ("Sprint) and AT&T
_____    Wireless PCS, LLC ("AT&T").

I, Chairman of the Board, certify that, in accordance with Massachusetts General Laws, Chapter 40A, Section 11, published in the Town Crier, a newspaper of general circulation in Wayland, on  August 28, 2003   , and on September 4, 2003, and that notice by mail, postage prepaid, was sent to the applicant/petitioner, abutters, owners of land directly opposite on any public or private street or way and abutters to abutters within three hundred feet of the property line all as they appear on the most recent applicable tax list and to the Wayland Planning Board on August 28,2003.  I further certify that notice of the Decision was mailed to each of the parties in interest as above designated on February 11, 2005.

A TRUE COPY ATTEST

**TOWN CLERK**
**TOWN OF WAYLAND**

_____
James E. Grumbach, Chairman

The record and decision was received and recorded as a public record on

2/11/05     TOWN CLERK, WAYLAND, MASSACHUSETTS

TOWN CLERK/ASSISTANT

2005 FEB 11 PM 12: 22

RECEIVED
TOWN OF WAYLAND
TOWN CLERK

Decision #03-34
135 Boston Post Road
Page 2 of 6

## FACTS AND REASONS:

### *Procedural background:*

This is the second of two consolidated cases.  The first case, ZBA No. 03-35, dealt with the adjoining property at 137 Boston Post Road.  A written decision was filed on or about July 30, 2004 ("July 2004 Decision").  The Board incorporates herein by reference all of the facts and reasons, and the applicable findings and rulings, in the July 2004 Decision.  Both cases involve these two co-applicants; both relate to similar requests to construct a wireless communication antenna and associated facilities; and the two applications were submitted together.  All applicants (including Eastern Towers, Inc., a third co-applicant as to No. 03-35 only) expressly acknowledged that, if the Board were to grant zoning relief, the applicants were seeking to construct a single antenna on only one of the two sites and were leaving it to the Board to choose which of the two sites would be constructed.  Furthermore, the evidence as submitted and as heard by the Board, both by the applicants and by the public, was expressly admitted for the purposes of both applications.  Both the applicants and the public stated at the hearing that they understood and agreed that all evidence taken in the earlier hearing applied to this decision as well.

The two applications were being heard simultaneously, in a single consolidated hearing, until April 26, 2004, when the Board granted applicant Sprint's request for a continuance on hearings on the instant site (135 Boston Post Road) while Sprint explored an alternative location. At the request of AT&T and Eastern Towers, hearings for the adjoining site (137 Boston Post Road) proceeded until the Board made a decision on that application in July 2004. Hearings on September 7th, October 12th, and December 14th, 2004 were solely for status reports from the applicants; no evidence was taken at such hearings. On those nights, the applicants appeared simply to report on progress of Sprint's review of an alternative location (the BECO towers north of Rt. 20 and east of Rt. 27), and to sign forms extending the time for the Board's final action and to agree upon continuance dates. Evidence-gathering resumed at the January 18th, 2005, hearing. The Board then closed the public portion of the hearings and deliberated on the application at the final hearing on February 1, 2005.

In the spring of 2004, Sprint requested a continuance to explore the use of the BECO towers.  The Board had requested that all applicants explore such use because, despite their initial claim that they had exhausted all potential sites in the proximity, they conceded that they had not considered the BECO towers.  The Board indicated, at the time, that the by-laws govern a variety of siting conditions, in addition to placement within the WCSD, in §198-1503.  Such conditions include collocation and the use of existing towers.  Section 198-1503.2.1 and 198- 503.2.2.

In the fall of 2004, the lead applicant in the current case (Sprint) completed its review of the potential alternative of siting an antenna on an existing tower owned by Boston Edison Company, BECO #131, just west of Plain Road in Wayland.  By letter dated October 28, 2004, to the Board of Selectmen, Sprint requested that the Town of Wayland consent to Sprint filing an application with the ZBA for use of town-owned land adjacent to the BECO tower.  By letter dated November 17, 2004, from Mark J. Lanza, Esq., counsel for the Town, to Edward J. Pare, Esq., counsel for Sprint, the Town declined to give its consent.

### *Additional evidence submitted for the January 18th, 2005, hearing:*

Since the beginning of the consolidated hearings, the Board has heard evidence on three other cell towers: one on Rt. 20 in the Sudbury landfill, west of the instant site; and two to the east of the instant site, located in Weston also on Rt. 20, near its police station.  The Sudbury tower ("Sudbury Tower"), which includes wireless antennas for Sprint and AT&T, has been completed and is operational; and one

Decision #03-34
135 Boston Post Road
Page 3 of 6

of the two Weston towers, including wireless facilities of Cingular, has been completed and is now operational (the "Cingular Tower"); the other Weston tower, planned for the use of AT&T and Sprint, has been permitted but not constructed (the "Unconstructed Tower"). The Sudbury Tower and the Cingular Tower in Weston are approximately 3 miles apart.

Additionally, AT&T introduced new drive-test data by letter dated January 10, 2005. The data is referenced in Sprint's letter as "follow call" and "scan test" drive data collected by AT&T personnel on September 27, 2004. The data was based upon signal strength testing by two Sony Ericsson "TEMS" units. The signal strength was divided into four categories, ranging from –30 dBM to -75 dBM; -76 dBM to -95 dBM; -96 dBM to -99 dBM; and -100 dBM or below. According to AT&T, the tests further demonstrated AT&T's claim to a significant coverage gap "along Route 20 ... and the surrounding areas". According to information provided at the hearing, and not rebutted by counsel for the applicants, the drive tests pre-date the commencement of operation of the Cingular Tower.

The Board also heard argument from interested parties and members of the public, but no additional evidence. The Board then solicited input from its independent RF consultant, David Maxson, who noted that, since the hearings began, Cingular and AT&T Wireless have merged, and Cingular's new services now operate on both its previous frequencies and the former AT&T frequencies. The Cingular Tower in Weston is therefore now a part of AT&T's coverage facilities. Accordingly, absent a claim of lack of capacity by Cingular (no claim of which has been made in this case), if Cingular has no coverage gap, then any coverage gap that previously existed for AT&T Wireless is no longer germane. In other words, by consolidating the two sets of frequencies, Cingular can service both its customers and AT&T's customers with either of the two frequencies and, if continuous service exists on the Cingular frequencies, then it has no need for continuous coverage on AT&T Wireless frequencies. Maxson also noted that Cingular has a slightly better frequency and coverage than AT&T had, which may be sufficient to close the modest gap in coverage along the dip on Rt. 20 in Wayland, near Temple Shir Tikva.    AT&T's counsel did not dispute these statements by Maxson.

Further, Sprint has announced an intention to merge with Nextel, although this merger has not yet occurred. Maxson noted, and counsel for both Sprint and AT&T confirmed, that the AT&T drive-test data do not relate to Sprint's frequency.

According to Maxson, the latest drive-test offered by AT&T used equipment and performed testing comparable in technical reliability and sophistication to the qualitative testing performed by Mark Hays, referenced in the July 2004 Decision.

It is worth noting three additional pieces of evidence submitted by the public at the time of the January 18th hearing. One was a copy of an article from a Bechtel technical journal, relating to coaxial cable (similar to the DAS system referenced in the Board's earlier ruling); the second was a newspaper article from the Metrowest Daily News, dated January 13, 2005 (five days before the hearing), relating to several fiberglass panels which fell from a monopole flagpole tower, similar to the design suggested by both applicants, onto nearby properties; and the third was a rendering of the "fall zone" of the 135 Boston Post Road tower, in the event it fell and did not break in half, as designed (according to the rendition and explanation, it would impact the house at 137 Boston Post Road; the clock store and parking lot; the house at 135 Boston Post Road; and Luigi's restaurant). As to this latter rendition, Mark Hays stated that he had used existing materials in evidence, graphically superimposing a rendering of a 120' fallen (horizontal) tower at ground level, from the base of the proposed tower site onto the surrounding structures.

Decision #03-34
135 Boston Post Road
Page 4 of 6

In Maxson's view, it is unclear if the coverage gap along Rt. 20 is significant, or of the extent of any such gap. Further, he indicated that, by virtue of the Cingular Tower now being available for AT&T's customers, perhaps there is no need for a 120' tower, as designed, to satisfy the coverage requirements of the Telecommunications Act, given technically feasible alternatives of, at least: (1) a distributed antenna system (DAS); and (2) a lower antenna height.

*Individual findings:*

1.  *Did the carriers sustain their burden of proving that there is a substantial (significant) gap in coverage?  No (3-1 as to Sprint; 4-0 as to AT&T)*

The Board considered Sprint and AT&T separately, since the evidence diverged as to the two co-applicants on this issue. As to Sprint, all of the Board members felt there was no significant change in the previously introduced substantial evidence as to a coverage gap, and reiterated their findings and reasoning from the July 2004 Decision. In that decision, the vote had been 4-1 (Koffman opposed)[2] that no substantial gap had been proven. (Koffman, on the other hand, had found in the earlier decision that Sprint had proven a substantial gap in coverage.) With no additional evidence as to Sprint on this issue, the Board again found (by 3-1, Koffman opposed) that Sprint had not proven a substantial gap in coverage, although Koffman again found that Sprint had proven a substantial gap in coverage. Koffman reasoned that the Unconstructed Tower in Weston -- which AT&T and Sprint had been planning to share -- may never be constructed and that Sprint's previous showing of a gap would not be affected by the Unconstructed Tower.

As to AT&T, Koffman felt that AT&T (through its merger with Cingular) now has the benefit of the Cingular Tower which has been permitted and constructed in Weston. She also reasoned that AT&T chose to introduce evidence of a drive-test which predated the Cingular Tower being operational, and that such drive-test was stale. Koffman joined the other Board members, who felt there was no significant change in the evidence as to AT&T. Hence, as to AT&T, the vote was 4-0 that it did not sustain its burden of showing a substantial (significant) gap in coverage.

2.  *Did the carriers sustain their burden of proving that they made a sufficient effort to evaluate other alternatives, none of which are feasible?  No (3-1 as to Sprint; 4-0 as to AT&T)*

Again, the Board considered Sprint and AT&T separately, since the evidence diverged as to the two co-applicants on this issue. As to Sprint, the Board commended Sprint for attempting to determine if an alternative location was viable, to wit, the BECO towers. However, the Board reasoned that, based on case law, Sprint has the "heavy burden" of demonstrating that the denial of one site is an effective prohibition, particularly where there was evidence that an alternative technology, to wit, DAS, could resolve any coverage gap. Specifically, the Board relied upon the case of *360 [Degrees] Communications Co. of Charlottesville v. Board of Supervisors of Albemarle County*, 211 F.3d 79, 87-88 (2000). Notwithstanding evidence of the DAS system, and AT&T's use of such system in Nantucket, Sprint did not proffer any evidence to establish that the Sprint signal could not effectively be carried by a DAS system, or otherwise establish that no other feasible technological solution existed as an alternative to the proposed Sprint tower.

---

[2]    That vote was based on a five-member panel, including Glick. See footnote 1.

Decision #03-34
135 Boston Post Road
Page 5 of 6

The Board was not comfortable authorizing construction of a tower simply because carriers propose such a tower. Given the significant desire to maintain the rural character of Wayland, particularly in an area closely surrounded by residential neighborhoods (even if in a Roadside Business District), the significant safety concerns in the event of a failure, and where the existing BECO towers were not feasible alternatives to the carriers, the carriers should be required to demonstrate that less intrusive technological alternatives to a proposed tower also are not feasible. The Board felt that the mere fact that alternative technologies are not desired, by the applicants, was not sufficient.

Hence, three of the Board members found that Sprint had not met its burden of proof. Koffman accepted Sprint's argument, to wit: in light of the Town's decision not to consent to an application for use of BECO Tower 131, it was unlikely that the Town would consent to the use of 60 or more telephone and other poles in the Town's right-of-way (for a DAS system).[3] Koffman found this a sufficient showing that no reasonable alternative locations are feasible or available.

As to AT&T, which has a DAS system in Nantucket and which did not seek additional time to ascertain the viability of the BECO towers, the Board voted 4-0 that it had not met its burden of proof that no other feasible alternatives existed.

> 3. _Did the applicants sustain their burden of demonstrating that the proposal would not materially diminish property values in the immediate vicinity? No (4-0)_

The Board reiterated its July 2004 Decision, noting that the carriers' evidence that property values would not be diminished, was not credible.

> 4. _Did the applicants sustain their burden of demonstrating that the proposal would not materially diminish public safety in the immediate vicinity, given the fact that the fall zone covers two residences, a retail store, a restaurant, and two parking lots? No (4-0)_

The Board reiterated the findings in its July 2004 Decision and noted that there has been a recent report of falling fiberglass panels from a cell tower in Sudbury within the last few weeks. Additionally, Koffman noted that 135 Boston Post Road is an undersized lot of approximately 17,000 square feet in a 40,000 square-foot zone and lacks sufficient frontage; the property already is encumbered with both a residence and a retail operation; the existing structures do not conform to setbacks, and indeed one of the buildings encroaches several inches over the property line and into the adjacent driveway, as does the fence surrounding the backyard (where the facility would be placed); that the current use of the property may be illegal, insofar as the special permit allowing a retail operation in this Roadside Business District required that there be a resident owner of the business, which is not in fact the case; that if the tower were constructed here, there would be no room left for a replacement septic system, should the current outdated system fail (which would eliminate the residential use that is the primary use allowed under the bylaws); that the location of the proposed facility would be in plain view of Rte. 20 and the parking lot at the abutting restaurant, making it an "attractive nuisance"; and that the fall zone for a tower at this location (unlike the 137 Boston Post Road location) covers parking lots and retail operations that are in use throughout the winter months, when (according to the evidence presented at the earlier hearings) tower failures are overwhelmingly more common.

---

[3]     This figure was provided by counsel for one of the applicants, in a closing statement. There was no formal evidence or other presentation, by AT&T or Sprint, as to DAS; AT&T's RF engineer Tim Wysocki had previously testified that AT&T used a DAS system in Nantucket, consisting of a number of standard 30 or 40 foot wooden electrical/telephone poles.

Decision #03-34
135 Boston Post Road
Page 6 of 6

> 5.    *Did the applicants sustain their burden of demonstrating that they are entitled to a variance under state law?  No (4-0)*

The Board reiterates its reasoning above, as well as in the July 2004 Decision. Given the Board's vote that the applicants failed to prove the existence of a substantial gap in coverage, only the three variance factors apply (e.g., shape, soil, topography affecting the lot but not the district generally, such that a literal enforcement of the bylaw would be a substantial hardship and that the desired relief could be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of the bylaw). The Board finds that the applicants failed to satisfy all three of the factors.

> 6.    *Did the applicants sustain their burden of demonstrating that they are entitled to a special permit?  No (4-0)*

The Board reiterates its reasoning above, as well as in the July 2004 Decision.  The Board notes that it believes the variance standard, and not a special permit standard, applies to this application.

> 7.    *Did the applicants sustain their burden of demonstrating that they are entitled to site plan approval?  No decision because the issue is moot*

The Board reiterates its reasoning in the July 2004 Decision.

> 8.    *Did the applicants sustain their burden of demonstrating that the building inspector should have issued a building permit?  No (4-0)*

The Board reiterates its reasoning in the July 2004 Decision.

**DATE OF FILING OF DECISION:**          **BY ORDER OF THE BOARD**

_____    February 11, 2005    _____    *James E. Grumbach*

James E. Grumbach, Chairman

**CERTIFICATION:**

The Zoning Board of Appeals, by delivery of a copy of this Decision to the Applicants, Sprint Spectrum, L.P. dba Sprint PCS and AT&T Wireless PCS, LLC, does hereby certify that copies of this Decision and all plans referred to in this Decision have been filed with the Planning Board of the Town of Wayland and with the Town Clerk of the Town of Wayland.

BOARD OF APPEALS

*James E. Grumbach*

James E. Grumbach, Chairman